IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TYLER MILLER**, an individual,<br><br>      Plaintiff,<br><br>      v.<br><br>**HENRY HEIMULLER**, **BRUCE HOLSEY**, **JEFF FLATT**, and **SHELLEY HENNESSY**, in their official capacities as board members of the Columbia 9-1-1 Communications District,<br><br>      Defendants. | Case No. 3:23-cv-293-SI<br><br>**OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION** |

Clifford S. Davidson and Drew L. Eyman, SNELL & WILMER LLP, 1455 SW Broadway, Suite 1750, Portland, OR 97201. Of Attorneys for Plaintiff.

Karen M. O'Kasey, HART WAGNER, LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

      In this case, the Court must decide whether the First Amendment protects in-person attendance at hearings of local government entities that are otherwise open to the public. Plaintiff Tyler Miller (Miller) is a Scappoose City Councilor, within Columbia County, Oregon. Columbia 9-1-1 Communications District (C911) is the public entity in Columbia County that answers 911 calls and dispatches public safety responses to those calls. Defendants Henry

PAGE 1 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy (collectively, Defendants) are the board members of C911. Miller is suing Defendants solely in their official capacities.

On February 23, 2023, C911, through its board, banned Miller from attending in person all future meetings of C911 that are otherwise open to the public. The ban allows him to observe the meetings remotely by videoconference and to make remote presentations. No one else who wants to attend C911 meetings that are otherwise open to the public are subject to these restrictions. Defendants issued this ban to prohibit Miller from attending C911 meetings in person shortly after Miller objected to C911 inviting only one vendor to submit a sole-source contracting proposal rather than engaging in competitive bidding. Miller has stated that he seeks to persuade other members of the public similarly to question this action by C911.

Miller filed his complaint on February 28, 2023, alleging violations of the First Amendment. On March 1, he moved for a temporary restraining order (TRO). The Court has reviewed Miller's motion and supporting declaration, Defendants' opposition memorandum and related declarations, and Miller's reply and additional declarations. The Court heard oral argument on March 9, 2023, and orally issued an order granting Miller's motion for TRO, stating that a written opinion and order would promptly follow. As explained below, the Court GRANTS Miller's motion for TRO.

## STANDARDS

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the

plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20.

The Supreme Court's decision in *Winter* rejected the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction. *Id.* at 22. The *Winter* decision, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

A TRO is necessarily of a shorter and more limited duration than a preliminary injunction.[1] Thus, the application of the relevant factors may differ, depending on whether the court is considering a TRO or a preliminary injunction.[2] Indeed, the two factors most likely to be

---

[1] The duration of a TRO issued *without* notice may not exceed 14 days but may be extended by a court once for an additional 14 days for good cause, provided that the reasons for the extension are entered in the record. Fed. R. Civ. P. 65(b)(2). When a TRO is issued with notice and after a hearing, however, the 14-day limit for TROs issued without notice does not apply. *See Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1222 n.1 (D. Or. 2016). Nevertheless, absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing." *Id*. Accordingly, unless the parties agree otherwise, a court should schedule a preliminary injunction hearing to occur not later than 28 days after the date that the court first issues a TRO.

[2] A preliminary injunction also is of limited duration because it may not extend beyond the life of the lawsuit. That is the role of a permanent injunction, which a court may enter as part

PAGE 3 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

affected by whether the motion at issue is for a TRO or a preliminary injunction are the "balancing of the equities among the parties" and "the public interest." Finally, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts, however, have discretion as to the amount of security and may even dispense with the security requirement altogether. *See Johnson*, 572 F.3d at 1086 ("Rule 65(c) invests the district court with discretion as to the amount of security required, if any." (quotation marks omitted)).

## FACTUAL FINDINGS

Based on the record evidence, the Court finds the following facts by a preponderance of the evidence.

### A. The Parties

As noted, Defendants are the board members of C911, and C911 is the entity in Columbia County that answers 911 calls and dispatches public safety responses to those calls. C911 is a district within the meaning of Chapter 198 of the Oregon Revised Statutes (ORS), which defines "district" to include 9-1-1 communications districts. ORS § 198.010(24). C911,

---

of a final judgment, when appropriate. A preliminary injunction, however, may last for months, if not years, while the lawsuit progresses toward its conclusion. *See Pac. Kidney*, 156 F. Supp. 3d at 1223 n.2.

therefore, is a "public body" within the meaning of ORS § 192.610(4) and must comply with the Oregon Public Meetings Law. In relevant part, this law states: "All meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided." ORS § 192.630(1). The board of directors is the governing body of C911.

Miller is a resident of Scappoose, Oregon, who was elected to the Scappoose City Council in 2020. Miller asserts that he is the appointed liaison between the Scappoose City Council and C911.[3] Miller Decl. ¶ 3. In 2016-2017, Miller worked as a consulting subcontractor for C911. Second Miller Decl. ¶ 5. Miller has attended more than one hundred C911 board meetings since 2015. Miller Decl. ¶ 5. Miller attended more than 70 C911 board meetings in person between October 22, 2015, and April 23, 2020, when C911 meetings went virtual during the COVID-19 pandemic. Second Miller Decl. ¶ 10. Miller has attended in person 15 meetings since C911 resumed holding in-person meetings on March 31, 2022. *Id.*

**B. The Ban on Miller's Physical Attendance at Public Meetings**

At the C911 board meeting on January 11, 2023, the C911 board discussed two proposals: (1) allowing Motorola to submit a sole source contracting proposal; and (2) merging the Columbia County emergency communications system with Washington County's system. Miller Decl. ¶ 6. The C911 board passed Resolution 2023-001. Compl. Ex. 5 at 4-5 (resolution text). This resolution directed C911 to engage with Motorola and Washington County and, afterward, to present to the C911 board a sole source proposal from Motorola for C911's new public safety radio system (Motorola Proposal). *See id.*

---

[3] Defendants dispute Miller's assertion, but this disagreement is not relevant to the resolution of the pending motion.

Later that day, Miller requested a private meeting with a board member, who did not reply; Miller then emailed several board members, stating his concerns. Miller Decl. ¶ 7; Compl. Ex. 1 (email). On January 18, 2023, C911 communicated through its outside council, Michael Peterkin, to the Scappoose City Council and Scappoose City Attorney, Peter Watts, requesting that Miller refrain from further comment and criticism of these two proposals until after the board could evaluate the Motorola contract proposal. Compl. Ex. 2. Watts responded later that day, noting the presence of community interest in the radio system procurement process. Compl. Ex. 3. On January 20, 2023, Peterkin again contacted Watts, clarifying the early stage of the procurement process and requesting that Miller not contact C911 directly. Compl. Ex. 4. Peterkin also expressed concern that Miller might contact other radio system providers, and Peterkin requested copies of all of Miller's communications with those providers. *Id.* Watts and Peterkin had several phone calls during January and February 2023, but at no point during these calls did Peterkin raise with Watts any concerns related to Miller's actions during any public meetings of C911 or his behavior generally, other than Miller's comments and criticisms described above. Watts Decl. ¶¶ 2-3.

On February 17, 2023, Miller posted his concerns about the Motorola Proposal on his "Tyler Miller: Scappoose City Council" Facebook page. Compl. Ex. 5 at 1-3. Miller urged residents to attend the February 23 meeting of C911 and stated that three seats on the C911 board are up for election this coming May. *Id.*

Six days later, on February 23, 2023, the C911 board members voted to ban Miller from attending C911 board meetings in person and from entering C911's premises or property. Miller Decl. ¶ 12, Compl. Ex. 6 (terms of the ban). Later that day, C911 sent Miller a letter notifying him of the ban, justifying it on the grounds that Miller's past behavior had "created a hostile

work environment," implying that Miller previously had sent "sexually explicit images," and now threatening Miller with legal action if he failed to comply with this exclusion order. Compl. Ex. 6. C911 sent a copy of the letter to the Scappoose City Attorney and to local law enforcement agencies. *Id.* C911 also explained to Miller that C911 would provide a remote access link so he could watch future meetings remotely and make remote presentations. *Id.* Miller denies having previously engaged in any inappropriate conduct.

Defendants purport to justify the ban as an appropriate response to employee complaints about Miller's past behavior at public meetings and his communications outside of those meetings. According to C911, sometime in January 2023, C911 employee Chandra Egan brought concerns about Miller's past behavior to the attention of Michael Fletcher, C911's executive director. Egan Decl. ¶ 4. Egan had become aware in January 2023 that Miller might seek to be reinstated as a reserve sheriff deputy, which could give Miller access to C911's building and communication systems. *Id.* Egan explained that she now attends C911 meetings remotely to avoid Miller because she is "fearful for [her] personal safety when he is present" and she previously had an "escape plan" from the building in case Miller's behavior were to turn violent. *Id.* ¶¶ 5-6.

Three years prior, in February 2020, Egan's deposition was requested for a lawsuit that Miller had brought against other C911 employees.[4] Egan had shared with Fletcher copies of portions of text messages between Egan and Miller between 2016 and 2017, some of which Egan had found offensive at the time. *Id.* ¶¶ 3-4. At her deposition on February 4, 2020, Egan testified that she stopped being on "friendly terms" with Miller because she wanted to separate her

---

[4] That lawsuit, styled as *Miller v. Watson*, Case No. 3:18-cv-562-SB (D. Or.), is continuing.

personal life from her professional life, adding that nothing had triggered this shift in their relationship. Second Miller Decl. Ex. 2, 8:16-9:12. Fletcher acknowledges seeing the text messages between Egan and Miller in February 2020. Fletcher Decl. ¶ 3.

Fletcher states that Egan and other employees came to him in late 2022 and early 2023 with complaints about Miller's conduct at C911 board meetings and had concerns about Miller's potential reinstatement as a reserve deputy sheriff. Fletcher Decl. ¶ 4. District employees Egan, Darrell Hooper, and unspecified others reported to Fletcher that they were "fearful and concerned about attending board meetings as required by their job duties because of Mr. Miller's presence at the board meetings and his behavior after the meetings." *Id.* ¶ 6. Hooper adds that C911 staff avoid Miller when Miller attends public meetings, and Hooper will rearrange furniture to separate herself from Miller during those meetings. Hooper Decl. ¶ 6. She adds that Miller has pushed the podium to "confront staff." *Id.* According to Hooper, staff feel unsafe after the meetings conclude when Miller remains on C911 property to speak with other attendees. *Id.* ¶ 7. Other declarants, however, have stated that Miller is respectful and well-behaved during the C911 public meetings. *See, e.g.*, Watts Decl. ¶ 4; McHugh Decl. ¶¶ 4-6.

Hooper also reported concerns about Miller's conduct outside of board meetings. Hooper states that Miller previously misused emergency communication systems when he was a reserve deputy sheriff to harass and intimidate dispatchers. Hooper Decl. ¶ 2. According to Miller, however, all C911 emergency, non-emergency, and administrative telephone lines are recorded, and reporting misuse of these systems is required, but there were never any such reports or complaints made about any unprofessional conduct by Miller. Second Miller Decl. ¶¶ 11-12; *see also* Hald Decl. ¶¶ 6-13.

**DISCUSSION**

As clarified during the TRO hearing, Miller is not currently seeking preliminary relief for any other aspects of the ban imposed by C911, including its prohibition on Miller entering any facility owned or leased by C911 not otherwise open to the public for the purpose of attending a public meeting. Thus, for the purposes of the pending motion for TRO, the Court considers only the ban on Miller's physical, or in person, presence at meetings of C911 that are otherwise open to the public.

**A. Likelihood of Success on the Merits**

    **1. Whether the First Amendment protects in-person attendance at public meetings**

A key issue is whether the First Amendment protects in-person attendance at public meetings. The First Amendment prohibits any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amend. I. As the Ninth Circuit has explained, "[o]pen government has been a hallmark of our democracy since our nation's founding." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir. 2012). "[T]he Supreme Court has long recognized a qualified right of access for the press and public to observe government activities." *Id.* at 898; *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 302 (1974) ("American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech . . . ."). Speech at local government meetings is protected by the First Amendment. *See White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("Citizens have an enormous [F]irst [A]mendment interest in directing speech about public issues to those who govern their city.").

Courts evaluate claimed unconstitutional restrictions on speech under a three-pronged test: (1) whether the First Amendment protects the plaintiff's speech; (2) the nature of the forum;

and (3) whether the justifications offered for limiting or excluding speech from the forum satisfy the requisite standards. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Defendants argue that in-person attendance at meetings is not "speech" or "expressive conduct" for First Amendment purposes, and therefore the Court should not even address the question of whether C911's justifications offered for restricting speech satisfy the requisite standards. According to Defendants, because Miller may attend and participate in C911 meetings virtually, he has suffered no restriction of his constitutional rights.

There are at least serious questions going to the merits of whether Miller's physical, in-person, attendance at C911 board meetings is protected speech. For conduct to possess "sufficient communicative elements" to fall within the scope of the First Amendment, it must have "an intent to convey a particularized message" and a great likelihood "that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Miller's expressed opposition to the Motorola Proposal in January and February of 2023 suggests that his presence at the March meeting, potentially with a group of other concerned citizens or taxpayers, or with other citizens or taxpayers present who might be persuaded to share Miller's concerns,[5] would be clearly and well understood by Defendants as conveying his concerns with the Motorola Proposal. Indeed, even if Miller were to say nothing, his physical

---

[5] Miller also raises an interesting question of whether relegating Plaintiff to a virtual format infringes on his First Amendment right of association. *See Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (stating that First Amendment protections include a "corresponding right to associate with others"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980) ("From the outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen."). Because the Court finds serious questions going to the merits on other First Amendment freedoms, the Court declines to address this argument at this time.

PAGE 10 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

presence sitting across from the C911 board members as they decide on the Motorola Proposal likely constitutes expressive conduct in a way that merely virtual presence cannot.

Finally, while no case directly answers whether physical presence at a board meeting qualifies as expressive conduct, this Court has listed as a key component of public meetings, together with "making live comments," the ability to "formally or informally meet[] with anyone, including elected council members, on the premises." *See Walsh v. Enge*, 154 F. Supp. 3d 1113, 1133 (D. Or. 2015). Hooper reports that after formal public meetings conclude, Miller has held informal meetings in the parking lot or lobby. Another court has found that restricting an allegedly disruptive plaintiff to participation in grievance hearings by telephone and videoconference could not cure the First Amendment harm the plaintiff suffered through physical exclusion because the plaintiff was "barred from expressing himself in-person." *Kugler v. Bd. of Ed. of the City of Chicago*, 2017 WL 3581176, at *11 (N.D. Ill. Aug. 18, 2017). There are at least serious questions as to whether physical, in-person, presence at public meetings otherwise open to members of the public is protected under the First Amendment. Thus, the Court proceeds to consider whether the restrictions on Miller's physical attendance satisfy the necessary First Amendment standards. *Cornelius*, 473 U.S. at 797.

**2.  Whether restrictions on Miller's attendance were reasonable and neutral**

The parties do not dispute that C911 meetings are limited public fora. *See Reza v. Pearce*, 806 F.3d 497, 502 (9th Cir. 2015) ("[C]ity council meetings, where the public has the opportunity to address officers of local government or local government agency, are limited public fora."). "[I]n order to safeguard the purpose of a limited public forum, the government may restrict speech in that forum." *Id.* at 503. In limited public fora, government restrictions on speech must be both reasonable and viewpoint neutral. *Id.*; *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (noting that regulations on speech in limited public

PAGE 11 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

fora must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"); *see also Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995) ("[L]imitations on speech at those meetings must be reasonable and viewpoint neutral, but that is all they need to be.").

Miller asserts that C911's ban is neither viewpoint neutral nor reasonable. He contends that the board singled out Miller after his criticism of the contract proposal. He also argues that the restrictions are unreasonable because physical presence is an important aspect of local government meetings, which implicated Miller's freedom of speech. Moreover, Miller argues, prospective bans from otherwise public meetings are inherently unreasonable and unconstitutional. Defendants respond by stating that their ban of Miller from in-person attendance is both reasonable and viewpoint neutral. Defendants argue that the sole basis of their ban was to respond to employees' complaints and concerns expressed about Miller's text messages and past conduct. According to Defendants, the timing of Miller's Facebook post about the Motorola Proposal, coming only six days before C911 issued the "no contact" letter, was purely coincidental.

Prospective bans from a limited public forum are generally unreasonable because they are not based on actual disruption. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 976 (9th Cir. 2010) ("Actual disruption means actual disruption. It does not mean constructive disruption . . . or imaginary disruption."); *Reza*, 806 F.3d at 506 ("No cases, in the Ninth Circuit or otherwise, even remotely suggest that *Norse*'s principle can be inverted to indefinitely ban an individual from a government building based on a single disruption of a hearing."). Miller relies on this Court's decision in *Walsh*, which granted relief to a citizen who had been prospectively

PAGE 12 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

banned from public meetings of the Portland City Council. *See generally* 154 F. Supp. 3d at 1113-34. In *Walsh*, the Court held that:

> to prospectively exclude Walsh, or any other individual, based on a past incident, or even several past incidents, of disruption is not exclusion from a given meeting for actual disruption: it is an impermissible prospective exclusion for possible or assumed disruption in the future. None of the justifications offered by Defendants show that [the ordinance permitting the prospective ban] is reasonable in light of the purpose of the forum. The Court declines Defendants' invitation to be the first federal court in the nation to uphold such a broad prospective exclusion ordinance.

*Id.* Thus, following the reasoning in *Walsh*, even if the factual allegations made by C911 against Miller are entirely true, a *prospective* ban that targets Miller's speech is unreasonable. If Miller is disruptive or otherwise abusive during a public C911 meeting, then he may be excluded from that meeting. *Id.* at 1133. ("Defendants have a simple alternative to the prospective exclusion ordinance. They can order any disruptive individual to leave the meeting that he or she is disrupting for the duration of that meeting.").

Defendants attempt to distinguish *Walsh* on the basis that C911 offered Miller the ability to *participate* virtually. Walsh was told that he could view City Council meetings live online, submit written comments on the posted agenda to the Council Clerk before meetings, and schedule appointments with other City offices. *Id.* at 1122. None of these restrictions, however, enabled Walsh to participate or communicate during the live meeting. By contrast, Defendants argue that Miller may attend virtually and may make presentations virtually.

Defendants, however, are unlikely to overcome their burden to show that the restriction on Miller's physical, in-person, presence reasonably fulfills a legitimate need, or that it is viewpoint neutral. Although Defendants asserted at oral argument that the temporal proximity between Miller's opposition to the Motorola Proposal and the ban imposed by Defendants was purely "coincidental," the timing raises serious questions of whether the ban was in fact a

PAGE 13 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

response to Miller's political statements. This conclusion is buttressed by the fact that C911 was at least partially aware of employees' complaints about Miller's conduct and text messages since February 2020, and Miller has attended many in-person meetings since that time. Further, at no point during the communications between C911's outside council and the Scappoose City Attorney in January and February 2023 did C911 raise any concerns related to Miller's behavior or his actions during public meetings. This all supports a conclusion that Defendants' current position is mere pretext.

Finally, to the extent that C911 contends that virtual meetings are an adequate alternative forum, Miller notes that C911 board members often keep their cameras off during meetings, which makes it impossible to observe them or sometimes to know who is speaking. C911's virtual meeting practices also would diminish Miller's ability to react or express himself in real time to speakers at the meeting.

At this stage of the proceedings, there are at least "serious questions going to the merits" regarding Plaintiff's First Amendment right to attend C911 board meetings in person and whether Defendants can justify their restrictions on Miller's speech in a limited public forum. *See All. for the Wild Rockies,* 632 F.3d at 1131-32. Thus, Plaintiff meets this first required condition for a TRO.

**B.  Irreparable Harm**

Miller has shown a serious threat to his First Amendment rights. The Court finds a likelihood of irreparable injury. "A 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief.'" *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005)); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

(quoting *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 2948.1 (3d ed. 2022) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech . . . , most courts hold that no further showing of irreparable injury is necessary."). Because Miller demonstrates the existence of a colorable First Amendment claim, Miller is likely to suffer irreparable, imminent harm in the absence of a TRO.

### C. Public Interest and Balance of the Equities

Defendants do not address either the balance of hardships or public interest requirements. The Court finds that these two factors tip sharply in favor of Miller. "Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Otter*, 682 F.3d at 826 (quotation marks omitted). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted) (holding that the district court did not abuse its discretion in granting an injunction under the Fourth Amendment). Because Miller has "raised serious First Amendment questions," the balance of hardships "tips sharply in [Plaintiff's] favor." *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted).

### CONCLUSION

The Court grants Plaintiff's motion for a TRO (ECF 2), as amended and narrowed in his reply and at oral argument. In his motion, Miller also seeks a preliminary injunction. *Id*. The Court directs the parties to confer and propose an appropriate schedule for briefing and hearing on whether the Court should issue a preliminary injunction and whether expedited discovery is needed. If the parties cannot reach an agreement on these issues, the Court will hear Plaintiff's motion for preliminary injunction on Thursday, March 30, 2023, at 2:00 p.m. in Courtroom 15B.

PAGE 15 – OPINION AND ORDER GRANTING TEMPORARY RESTRAINING MOTION

**TEMPORARY RESTRAINING ORDER**

1. Plaintiff may physically attend any public meetings that the C911 board conducts in person that is otherwise open to the public.

2. Defendants Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy, and any persons working in active concert with them, may not prohibit Tyler Miller from physically attending any public, in-person C911 meetings. Defendants, however, may hold such a meeting in a publicly accessible space that is separated from the rest of the C911 facility that is not otherwise open to the public.

3. In the interest of justice, Plaintiff need not provide any security, and the Court waives all requirements under Rule 65(c) of the Federal Rules of Civil Procedure.

4. This Temporary Restraining Order shall expire on April 6, 2023, at 2:00 p.m., which is twenty-eight (28) days after the Court's Order orally stated on March 9, 2023, unless otherwise extended by stipulation of the parties or by further Order of the Court.

5. The Court will receive evidence and hear argument on Plaintiff's motion for preliminary injunction on Thursday, March 30, 2023, at 2:00 p.m. in Courtroom 15B of the United States Courthouse in Portland, Oregon. The parties may, after conferring, request that the Court conduct this hearing on a different date or time.

**IT IS SO ORDERED**.

DATED this 13th day of March, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge