# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TYLER MILLER**, an individual,<br><br>   Plaintiff,<br><br>   v.<br><br>**HENRY HEIMULLER**, **BRUCE HOLSEY**,<br>**JEFF FLATT**, and **SHELLEY HENNESSY**,<br>in their official capacities as board members of<br>the Columbia 9-1-1 Communications District,<br><br>   Defendants. | Case No. 3:23-cv-293-SI<br><br>**OPINION AND ORDER** |

Clifford S. Davidson and Drew L. Eyman, SNELL & WILMER LLP, 1455 SW Broadway, Suite 1750, Portland, OR 97201. Of Attorneys for Plaintiff.

Karen M. O'Kasey, HART WAGNER LLP, 1000 SW Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Tyler Miller (Miller) is a Scappoose City Councilor, within Columbia County, Oregon. Columbia 9-1-1 Communications District (C911) is the public entity in Columbia County that answers 9-1-1 calls and dispatches public safety responses. Defendants Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy (collectively, Defendants) are the board members of C911. Miller is suing Defendants solely in their official capacities.

On February 23, 2023, C911, through its board, banned Miller from: (1) attending in-person board meetings at C911 that are otherwise open to the public; (2) entering C911 premises or any property owned or leased by C911; and (3) contacting C911 employees directly, indirectly, or through C911's communication systems except in an emergency. Compl. Ex. 6. The ban allows Miller to observe C911 meetings remotely by videoconference and to make remote presentations. The ban also indicates that if Miller needs to contact C911 for non-emergency reasons, he may call one phone number, and C911 will respond to written requests for public records in the ordinary course. C911 explains the ban as necessary to protect its employees, stating:

> The above notices are necessary to shield [C911] employees from your conduct, which has created a hostile work environment. You have no right to harass and intimidate [C911] employees with your words, your conduct, or with offensive, sexually explicit images. Further, you have no right to put employees in fear of you or fear that you will retaliate against them.

*Id.* Finally, the ban states that if Miller violates the notices, he "will be subject to civil or criminal actions. Local law enforcement will be provided a copy of this notice for future enforcement purposes." *Id.*

Defendants issued this ban shortly after Miller voiced objections to C911's proposals for its emergency contact system. C911's proposals would invite only one vendor, Motorola Solutions, to submit a sole-source contracting proposal rather than engage in competitive bidding, and would merge C911 with Washington County's 9-1-1 system. Miller disagrees with these proposals and has advocated against them. Miller alleges that the ban stems from his opposition to these proposals. Defendants contend that the ban is a reasonable response to complaints from C911 employees about Miller.

Miller filed his complaint on February 28, 2023, alleging violations of the First Amendment, including First Amendment retaliation. He seeks declaratory, injunctive, and monetary relief under 42 U.S.C. § 1983. On March 1, Miller moved for a temporary restraining order (TRO). His motion for TRO addressed only that portion of the ban that prohibited Miller from physically attending in-person, public meetings of C911. The Court granted Miller's motion on March 13, 2023 (TRO Opinion), enjoining C911 from preventing Miller from physically attending any public meetings that the C911 board conducts in person that are otherwise open to the public. After the Court issued this TRO, C911 has been holding all of its public meetings only online.

Miller now seeks preliminary injunctive relief against the entire ban, including its prohibition on Miller entering any facility owned or leased by C911 or contacting C911 employees. The parties presented written arguments and declarations, and counsel appeared at a hearing held on May 15, 2023. The Court notes that both parties declined to present live witnesses at the hearing, precluding the Court from assessing the credibility of any declarants. For the reasons explained below, the Court grants in part and denies in part Miller's motion for preliminary injunction.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20.

The Supreme Court's decision in *Winter* rejected the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction. *Id.* at 22. The *Winter* decision, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

"Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Florida Entmt. Mgmt., Inc*., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction."). As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Rule 65 of the Federal Rules of Civil Procedure directs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Federal courts,

however, have discretion over the amount of security and may even dispense with the security requirement altogether. *See Johnson*, 572 F.3d at 1086 ("Rule 65(c) invests the district court with discretion as to the amount of security required, if any." (quotation marks omitted)).

## FACTUAL FINDINGS

Based on the record evidence, and noting the lack of any request for an evidentiary hearing, the Court finds the following facts by a preponderance of the evidence.

### A.  Parties

Defendants are the board members of C911. C911 is the entity in Columbia County that answers 911 calls and dispatches public safety responses. C911 is a district within the meaning of Chapter 198 of the Oregon Revised Statutes (ORS), which defines "district" to include 9-1-1 communications districts. ORS § 198.010(24). C911, therefore, is a "public body" under § 192.610(4) and must comply with the Oregon Public Meetings Law. This law states: "All meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided." ORS § 192.630(1). The board of directors is the governing body of C911.

Miller is a resident of Scappoose, Oregon, who was elected to the Scappoose City Council in 2020. The Scappoose City Council appointed Miller as their liaison to C911. First Miller Decl. ¶ 3, Third Miller Decl. ¶ 10. From 2016 to 2017, Miller worked as a consulting subcontractor for C911. Second Miller Decl. ¶ 5. Miller has attended more than one hundred C911 board meetings since 2015. First Miller Decl. ¶ 5. Miller attended more than 70 C911 board meetings in person between October 22, 2015, and April 23, 2020, when C911 meetings went virtual during the COVID-19 pandemic, and 15 in-person meetings since C911 resumed holding in-person meetings on March 31, 2022. Second Miller Decl. ¶ 10.

**B.  Miller's Opposition to C911 Proposals**

At the C911 board meeting held on January 11, 2023, the C911 board discussed two proposals: (1) allowing Motorola to submit a sole source contracting proposal; and (2) merging the Columbia County emergency communications system with Washington County's system. First Miller Decl. ¶ 6. The C911 board passed Resolution 2023-001. Compl. Ex. 5 at 4-5 (resolution text). This resolution directed C911 to engage with Motorola and Washington County and, afterward, to present to the C911 board a sole source proposal from Motorola for C911's new public safety radio system (Motorola Proposal). *See id.*

Miller opposes these proposals and spoke out against them at least a dozen times before February 2023, including before September 2022. Third Miller Decl. ¶ 2. After the board meeting on January 11, 2023, Miller requested a private meeting with a board member, who did not reply; Miller then emailed several board members, stating his concerns. First Miller Decl. ¶ 7; Compl. Ex. 1 (email).

On January 18, 2023, C911 communicated through its outside council, Michael Peterkin, to the Scappoose City Council and Scappoose City Attorney, Peter Watts, requesting that Miller refrain from further comment and criticism of these two proposals until after the board could evaluate the Motorola contract proposal. Compl. Ex. 2.  Watts responded later that day, noting the presence of community interest in the radio system procurement process. Compl. Ex. 3. On January 20, 2023, Peterkin again contacted Watts, clarifying the early stage of the procurement process and requesting that Miller not contact C911 directly. Compl. Ex. 4. Peterkin also expressed concern that Miller might contact other radio system providers, and Peterkin requested copies of all of Miller's communications with those providers. *Id.* Watts and Peterkin had several phone calls during January and February 2023, but at no point during these calls did Peterkin raise with Watts any concerns related to Miller's actions during any public meetings of C911 or

his behavior generally, other than Miller's comments and criticisms described above relating to the board's decisions. Watts Decl. ¶¶ 2-3. The Mayor of Scappoose, Joe Backus, met with Michael Fletcher, C911's executive director, on February 1, 2023; Fletcher also did not report any concerns about Miller to Mayor Backus. Backus Decl. ¶¶ 2-3.

On February 17, 2023, Miller posted his concerns about the Motorola Proposal on his "Tyler Miller: Scappoose City Council" Facebook page. Compl. Ex. 5 at 1-3. Miller urged residents to attend C911's next meeting on February 23 and to oppose the proposals. *Id.* Miller also stated that three seats on the C911 board are up for election on May 16, 2023. *Id.*

Six days later, on February 23, 2023, the C911 board members voted to ban Miller from attending C911 board meetings in person and from entering C911's premises or property. Miller Decl. ¶ 12, Compl. Ex. 6 (terms of the ban). Later that day, C911 sent Miller a letter notifying him of the ban, purporting to justify its ban on the grounds that Miller's past behavior had "created a hostile work environment," implying that Miller had sent "sexually explicit images," and threatening Miller with legal action if he violated this ban. Compl. Ex. 6. C911 sent a copy of the letter to the Scappoose City Attorney and to local law enforcement agencies. *Id.* C911 also explained to Miller that C911 would provide an access link so he could watch future meetings remotely and make remote presentations. *Id.* Miller denies having engaged in any inappropriate conduct.

## C. Employee Complaints

Defendants argue that their ban is an appropriate response to employee complaints about Miller's past behavior at public meetings and his communications outside of those meetings. According to C911, on or about January 3, 2023, C911 employee Chandra Egan brought concerns about Miller's past behavior to the attention of Fletcher. Egan Decl. ¶ 4; Van Meter Decl. Ex. 1 (Van Meter Report) at 2. Egan had become aware in January 2023 that Miller might

seek to be reinstated as a reserve deputy sheriff for Columbia County, which could give Miller access to C911's building and communication systems. Egan Decl. ¶ 4. Egan explained that she now attends C911 meetings remotely to avoid Miller because she is "fearful for [her] personal safety when he is present" and she once had an "escape plan" from the building in case Miller's behavior were to turn violent. *Id.* ¶¶ 5-6.

In February 2020, Egan's deposition was requested for a different lawsuit that Miller had brought against other C911 employees.[1] Egan had shared with Fletcher copies of portions of text messages between Egan and Miller between 2016 and 2017, some of which Egan had found offensive at the time. *Id.* ¶¶ 3-4. There have been no further text messages between Egan and Miller after 2017. At her deposition on February 4, 2020, Egan testified that she stopped being on "friendly terms" with Miller because she wanted to separate her personal life from her professional life, adding that nothing had triggered this shift in their relationship. Second Miller Decl. Ex. 2, 8:16-9:12. Fletcher acknowledges in his current declaration that in February 2020 he saw the 2016 and 2017 text messages between Egan and Miller. Fletcher Decl. ¶ 3.

Fletcher also states in his declaration that Egan and other employees came to him in late 2022 and early 2023 with complaints about Miller's conduct at C911 board meetings and had concerns about Miller's potential reinstatement as a reserve deputy sheriff. Fletcher Decl. ¶ 4. C911 employees Egan, Darnell Hooper, and unspecified others reported to Fletcher that they were "fearful and concerned about attending board meetings as required by their job duties because of Miller's presence at the board meetings and his behavior after the meetings." *Id.* ¶ 6. Hooper adds that she and other C911 staff avoid Miller when he attends public meetings, and

---

[1] That lawsuit, styled as *Miller v. Watson*, Case No. 3:18-cv-562-SB (D. Or.), is continuing.

Hooper will rearrange furniture to separate herself from Miller during those meetings. Hooper Decl. ¶ 6. She adds that Miller has pushed the podium to "confront staff." *Id.* According to Hooper, staff feel unsafe after the meetings conclude when Miller remains on C911 property to speak with other attendees. *Id.* ¶ 7. Other declarants, however, have stated that Miller is respectful and well-behaved during the C911 public meetings. *See* Watts Decl. ¶ 4; McHugh Decl. ¶¶ 4-6.

Hooper also reported concerns about Miller's conduct outside of board meetings. Hooper states that Miller, when he was previously a reserve deputy sheriff, had misused emergency communication systems to harass and intimidate dispatchers. Hooper Decl. ¶ 2. According to Miller, however, all C911 emergency, non-emergency, and administrative telephone lines are recorded, and reporting any misuse of these systems is required, but there were never any such reports or complaints made about any unprofessional conduct by him. Second Miller Decl. ¶¶ 11-12; *see also* Hald Decl. ¶¶ 6-13.

In addition to the concerns raised by Egan and Hooper, Heather Van Meter's investigative report contains "anonymous" complaints about Miller. Van Meter Report at 2. Van Meter, a lawyer from Bullard Law who has represented C911 since November 2021, interviewed four employees in January 2023 and discussed her conclusions and recommendations in a report issued on February 6, 2023. Van Meter Decl. ¶¶ 1, 4; Van Meter Report at 1. The report discusses the text messages with Egan and other communications with employees, alleged intimidation and harassment attributed to Miller, and personal safety and retaliation concerns. *See generally* Van Meter Report. Based on her employee interviews and Miller's other past dealings with C911, Van Meter recommended that C911 restrict Miller's communication to one designated phone or email address and restrict his access to C911 property and public meetings,

among other recommendations. *See id.* at 13-17. Van Meter states that during her investigation, she was unaware of Miller's attendance at the January 11, 2023 board meeting or his February 17, 2023 Facebook post. Van Meter Decl. ¶ 3.

Miller was unaware of any complaints about him made by Egan or Hooper, or that C911 had conducted its investigation, until Defendants responded to his motions for injunctive relief in this lawsuit. Third Miller Decl. ¶ 9. Miller presents declarations from past colleagues who describe their personal interactions with Miller, as well as his reputation in the community, as "positive and professional." *See* Smith Decl. ¶¶ 3-6. Former C911 employees who interacted with Miller in his capacity as a reserve deputy sheriff state that they do not recall any time when Miller was rude, harassing, or unprofessional to anyone, and that Miller was generally well-liked and respected. *See* Jenkins Decl. ¶¶ 4-7, Copeland Decl. ¶¶ 4-9.

**D.  Virtual Meetings**

After the Court issued its TRO on March 13, 2023, C911 has held all public board meetings remotely by Zoom. During the March 23, 2023 virtual meeting, Miller was blocked from seeing any other public participants and found it difficult to hear the board members. Third Miller Decl. ¶ 3. He was able to message only the "hosts and panelists" but not any other public attendees. *Id.* During previous C911 board meetings over Zoom, C911 allowed viewing and messaging the other participants. *Id.* ¶ 4. Other members of the public who have publicly opposed the Motorola proposal experienced the same limitations at the March 23 meeting. Ryan Decl. ¶¶ 3-4, Plantz Decl. ¶¶ 2-3.

DISCUSSION

In his complaint, Miller seeks preliminary injunctive relief prohibiting Defendants from (a) banning Miller from attending public C911 meetings in person, and (b) retaliating against Miller based on his speech or petition conduct. Miller moved for, and the Court granted, a TRO

addressing only the portion of the ban barring Miller's attendance at public meetings of the C911

board. Miller's motion for preliminary injunction, however, now seeks full preliminary

injunctive relief as requested in the complaint. The Court therefore revisits its analysis of the

public meetings portion of the ban under the standards for preliminary injunction and addresses

the need for injunctive relief on Miller's First Amendment retaliation claim. Only the retaliation

claim challenges the portions of the ban that prevent Miller from accessing C911 property or

contacting C911 employees; Miller has not argued that he has a First Amendment right to access

C911 property generally or to use the C911 communications systems for non-emergency

purposes.

## A.  First Amendment Protections for In-Person Attendance at In-Person Public Meetings

### 1.  Likelihood of Success on the Merits

As discussed in the Court's TRO Opinion, the First Amendment protects speech at local

government meetings. *See White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990)

("Citizens have an enormous [F]irst [A]mendment interest in directing speech about public

issues to those who govern their city."). Courts evaluate claimed unconstitutional restrictions on

speech under a three-pronged test: (1) whether the First Amendment protects the plaintiff's

speech; (2) the nature of the forum; and (3) whether the justifications offered for limiting or

excluding speech from the forum satisfy the requisite standards. *Cornelius v. NAACP Legal Def.*

*& Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

On the first prong, the Court refers to and incorporates its analysis in the TRO Opinion

for why there are at least serious questions going to the merits of whether Miller's physical, in-

person, attendance at C911 board meetings is protected speech.[2] *See Miller v. Heimuller*, 2023

---

[2] Plaintiff again asserts that by singling out and banishing him to virtual attendance,
Defendants have violated Plaintiff's First Amendment right of *association* with the group of

WL 2474345, at *4-5 (D. Or. Mar. 13, 2023). The second prong is not in dispute; C911 board

meetings are limited public fora. In limited public fora, government restrictions on speech must

be both reasonable and viewpoint neutral. *Reza v. Pearce*, 806 F.3d 497, 503 (9th Cir. 2015).

On the third prong, Defendants renew their arguments that the ban on Miller's in-person

attendance at C911 meetings is both reasonable and viewpoint neutral. Defendants argue that the

sole basis of their ban was to respond to employees' complaints and concerns expressed about

Miller's text messages and past conduct. Defendants present new evidence that Egan complained

about Miller to Fletcher on or about January 3, 2023, and because of this complaint, C911

retained Van Meter to investigate Egan's concerns in the first week of January. According to

Van Meter, this investigation began before the C911 board meeting on January 11, 2023, at

which the C911 board discussed the proposals about the future direction of C911. It was at this

meeting that Miller stated his objections and after this meeting that Miller emailed his concerns

to board members. Van Meter completed and submitted her investigative report on February 6,

2023, before Miller's Facebook post on February 17, 2023 encouraging opposition to the

proposals.[3] The report details multiple serious employee concerns and recommends restrictions

concerned citizens, organized by Plaintiff and others, who may continue to attend C911 meetings
in person to oppose the Motorola single-source contract and Washington County merger
proposals. The Court again declines to reach this issue, as it finds at least serious questions going
to the merits on protected speech.

[3] Miller asks the Court to disregard the Van Meter Report as inadmissible hearsay or, at
the very least, give it very little weight. Miller argues that, despite the relaxed evidentiary rules at
the preliminary injunction stage, courts may not consider hearsay evidence submitted by the non-
moving party. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial
court may give even inadmissible evidence some weight, when to do so serves the purpose of
preventing irreparable harm before trial.") Miller cites no authority beyond *Flynt* to show that
non-moving parties are so restricted. The Ninth Circuit has stated the rule broadly, without
narrowing it only to the moving party. *See Herb Reed Enters.*, 736 F.3d at 1250 n.5;
*Johnson*, 572 F.3d at 1083. This Court, following many in the Ninth Circuit, interprets the
doctrine more broadly to mean that a district court has discretion to rely on hearsay statements
when deciding whether to issue a preliminary injunction, regardless of which party submits the

similar to those in the ban. Defendants assert that the results of the investigation and Van Meter's recommendations[4] are the *only* reasons that C911 acted against Miller. Defendants add that the timing of the ban, which C911 issued six days after Miller's Facebook post about the Motorola proposal, was purely coincidental and completely unrelated to Miller's opposition to the board's proposals for C911's future.[5]

---

evidence. *See, e.g.*, *Leskinen v. Perdue*, 2019 WL 95513, at *2 (E.D. Cal. Jan. 3, 2019) (rejecting argument that the court could not consider the defendant's hearsay evidence because "the rules of evidence do not apply strictly to preliminary injunction proceedings" (quoting *Mahon v. Morton Golf, LLC*, 2017 WL 1351070, at *2 n.2 (E.D. Cal. Apr. 6, 2017)); *A.H.R. v. Washington State Health Care Auth.*, 469 F. Supp. 3d 1018, 1030 n.8 (W.D. Wash. 2016) ("Plaintiffs object that the testimony upon which [Defendant] relies is based largely on hearsay. The rules of evidence do not strictly apply in the context of a motion for preliminary injunction, and accordingly the court does not abuse its discretion by considering hearsay evidence."). The Court notes that limiting its consideration of hearsay evidence to the party seeking a preliminary injunction would give the moving party a significant advantage and frustrate *Winter*'s instruction that preliminary injunctions are an "extraordinary remedy." *Winter*, 555 U.S. at 22.

Although "hearsay testimony may be considered by the court in the context of a motion for preliminary injunction, . . . the court has discretion to weigh the evidence as required to reflect its reliability." *A.H.R*, 469 F. Supp. 3d at 1030 n.8. The Court finds persuasive Miller's various arguments for why the report deserves little weight: (1) Van Meter is not a neutral fact finder because she has worked for C911 since November 2021, Van Meter Decl. ¶ 1; (2) the hearsay itself may be unreliable because it describes comments from unnamed persons and often consists of double hearsay; and (3) Defendants offer no evidence to bolster the concerns in the report, even though that evidence would likely exist in other forms, such as recordings of rude calls, logs of critical comments in the CAD system, recordings of improper behavior at public meetings, or emails harassing C911 employees through public records requests. Indeed, in *Johnson*, the Ninth Circuit pointed to the "many exhibits, affidavits, declarations[,] and factual allegations" submitted by all parties in addition to the challenged hearsay evidence when deciding that the district court did not abuse its discretion in considering hearsay.

[4] Defendants previously told the Court that they are not relying on any advice of counsel affirmative defense and have not raised such a defense.

[5] In discussing his retaliation claim, Miller stresses the temporal proximity between his opposition to the controversial proposals and C911's ban. *See Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 870 (9th Cir. 2016) ("[A] plaintiff may rely on evidence of temporal proximity between the protected activity and alleged retaliatory conduct to demonstrate that the defendant's purported reasons for its conduct are pretextual or false."). Miller, however, also

Defendants have not met their burden to show that the restriction on Miller's physical, in-person, presence at public meetings is reasonable and not pretextual. C911 was at least partially aware of employees' complaints about Miller's conduct since February 2020, when Egan provided Fletcher with a text message chain between her and Miller. Fletcher Decl. ¶ 3; Egan Decl. ¶ 4. This casts doubt on Defendants' argument that the ban represented prompt corrective remedial action to address employee complaints. Miller has also attended many in-person meetings since Egan's initial complaint. Fourth Miller Decl. ¶ 3 (Miller and Egan jointly attended 18 in-person public meetings of C911 since 2020). Finally, the only evidence that Defendants present of Miller's improper behavior at public meetings are declarations from Egan and Hooper, which are contradicted by other declarations reporting that Miller is respectful and well-behaved during the C911 public meetings. *See, e.g.*, Watts Decl. ¶ 4; McHugh Decl. ¶¶ 4-6; Backus Decl. ¶ 4. There are no minutes or recordings showing any improper behavior by Miller at public meetings. The Court thus finds that Defendants have not satisfied their burden "to justify the restriction" on Miller's speech. *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

But even if the Court accepted Defendants' arguments about the Van Meter Report, prospective bans against speaking in limited public fora are generally unreasonable. The Court incorporates its prior analysis from the TRO Opinion on this point. *Miller*, 2023 WL 2474345, at *6 (discussing *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1133-34 (D. Or. 2015). The Court concludes that even if the factual allegations made by C911 against Miller are true, a *prospective* ban that targets Miller's speech is unreasonable. If Miller is disruptive or otherwise abusive during a public C911 meeting, then he may be ordered to leave that meeting.

---

points out that he had been speaking out against the proposals for months, including before September 2022. Third Miller Decl. ¶ 2.

The Court reiterates that there are at least serious questions going to the merits of whether physical, in-person, presence at public meetings otherwise open to members of the public is protected under the First Amendment. The Court cautions, however, that its analysis contemplates only the context of this case: meetings otherwise held in-person from which C911 excludes Miller alone. No other member of the public is subject to these restrictions. Any analysis that disputes the sufficiency of virtual participation as an *alternative* forum does not necessarily apply when the online meeting is the *only* forum.

Finally, Miller's complaint and motion for preliminary relief do not challenge ORS § 192.670, the Oregon law governing meetings by public bodies held by telephone or other electronic means of communications. Miller also does not challenge, and the Court does not opine upon, whether online-only meetings held pursuant to ORS § 192.670 infringe on First Amendment rights. *See* Pl.'s Mot. Prelim. Inj. 1 n.1 ("Miller does not, at this time, challenge the constitutionality of holding solely remote meetings . . . ."). Thus, Miller's concerns and declarations about being unable to see or send messages to other participants in the virtual meeting format are irrelevant. *See* Third Miller Decl., ¶¶ 3-4; Plantz Decl., ¶ 3; Ryan Decl., ¶ 4.[6] The Court therefore clarifies and restricts its analysis to meetings that the C911 board conducts *in person* that are otherwise open to the public.

### 2. Irreparable Harm

Defendants contend that because C911 board meetings take place remotely pursuant to ORS § 192.679, Miller will not suffer any irreparable harm from the ban against his in-person attendance. The Court, however, is unwilling to assume that C911 will continue its present

---

[6] Plaintiff also does not allege that he and the others experiencing the alleged virtual limitations are singled out or targeted for their viewpoints. If anything, these declarations show that Plaintiff now is being treated the same as other members of the public.

practice of holding all board meetings virtually. The voluntary cessation doctrine, although

pertaining to mootness, is instructive here: a party's voluntary cessation of an unlawful practice

"does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not

reasonably be expected to recur." *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607

(2022) (quotation marks omitted); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)

("[A] defendant cannot automatically moot a case by simply ending its unlawful conduct once

sued."). In this case, although C911 has voluntarily stopped conducting meetings in person, there

is no guarantee that Defendants will continue their virtual meeting practices; nothing would

prevent C911 from resuming in-person meetings and excluding Miller as soon as the Court lifts

the TRO.

      As discussed in the Court's TRO Opinion, "[a] colorable First Amendment claim is

irreparable injury sufficient to merit the grant of relief." *Miller*, 2023 WL 2474345, at *7

(quotation marks omitted) (quoting *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014)). Because

Miller demonstrates the existence of a colorable First Amendment claim for unlawfully

infringing on his protected speech, Miller is likely to suffer irreparable, imminent harm if he is

denied attendance from any public meetings that the C911 board conducts *in person* that are

otherwise open to the public.

### 3.  Balance of Equities and Public Interest

      The Court refers to and incorporates its prior finding in the TRO Opinion that the

remaining two factors of the *Winter* analysis, balance of the equities and public interest

requirements, tip sharply in favor of Miller on this issue. *Id.* Because Miller has "raised serious

First Amendment questions," the balance of hardships "tips sharply in [Plaintiff's] favor." *Cmty.*

*House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (quotation marks omitted). In

addition, "[c]ourts considering requests for preliminary injunctions have consistently recognized

the significant public interest in upholding First Amendment principles." *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (quotation marks omitted).

Because all four *Winter* factors favor Miller on his first claim, the Court extends the interlocutory relief previously issued in the TRO. Until this case is finally decided on the merits, Miller may physically attend any public meetings that the C911 board conducts in person that are otherwise open to the public. Defendants, and any persons working in active concert with them, may not prohibit Tyler Miller from physically attending any public, in-person C911 meetings.

## B. First Amendment Retaliation

In his second claim, Miller alleges that all three aspects of the ban instituted by Defendants constitute First Amendment retaliation and asks the Court to enjoin the entire ban on that basis. Defendants do not directly address that argument. Instead, Defendants argue that Miller has no "First Amendment right" to any of the three aspects of the ban—(1) in-person meeting attendance, (2) access to C911 property, and (3) use of C911 communications systems. But Miller has not argued that he has a First Amendment right to enter C911 property generally or to use the C911 communications systems. Rather, he argues that those aspects of the ban are retaliatory responses to his First Amendment-protected speech. Accordingly, Defendants' arguments on those latter two aspects of the ban are irrelevant. *See O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) ("Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment.").

### 1. Likelihood of Success on the Merits

There are three elements of a First Amendment retaliation claim. A plaintiff must show: "(1) [he] engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there

was a nexus between the defendant's actions and an intent to chill speech." *Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (quotation marks omitted). The Ninth Circuit has emphasized that "motive is a necessary element of a retaliation claim." *Id.* As noted, the Ninth Circuit also has held that "[o]therwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment." *O'Brien*, 818 F.3d at 932; *see also Koala*, 931 F.3d at 905.

For the first element of a First Amendment retaliation claim, Miller argues that he was engaged in constitutionally protected political speech when he spoke out against the controversial proposals, rallied public opposition to the proposals, and promoted candidates to run for C911 board positions in the upcoming election. On the second element, Miller argues that the ban caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in political speech and prevents Miller from performing his job as a City Councilor. Defendants do not respond to these points.

On the third element, Defendants assert that they imposed the ban *solely* because of employee complaints about Miller's behavior and the Van Meter Report, as discussed earlier in this decision. Miller argues that this explanation is pretextual and is unlikely to survive the burden-shifting framework that courts apply to First Amendment retaliation claims. *See Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) (after plaintiff makes prima facie showing of retaliation, burden shifts to defendant "to demonstrate that even without the impetus to retaliate he would have taken the action complained of"). Miller cites, for example, the lack of prompt corrective remedial action to Egan's prior complaints and the lack of recorded or written evidence of any harassing behavior by him, which the Court already discussed. Although

Defendants largely fail to respond to the merits of Miller's retaliation claim, the Court finds that Miller has raised serious questions going to the merits of this claim.

### 2. Irreparable Harm

Along with the previously discussed harms resulting from exclusion from in-person public meetings, Miller argues that irreparable harm will result from the aspects of the ban that prevent his access to C911 property generally and his use of C911 communications systems for all but emergency purposes. Miller argues that the ban will prevent him from meeting with C911 officials and the public about public issues, lobbying C911 officials, attending other meetings on C911 property, and possibly rejoining the Columbia County Sheriff's department as a reserve deputy sheriff. Miller states that as a reserve deputy sheriff, he would need to access C911 communications systems and to communicate with on-duty C911 dispatchers. Third Miller Decl. ¶ 13. Defendants do not respond to these points.

The Court disregards Miller's assertions about his potential future needs as a reserve deputy sheriff because he does not yet serve in this position and has not shown that he would receive that position but for C911's ban. Thus, Miller's concerns in this regard are speculative. The ban does not prevent Miller from seeking or being appointed as a reserve deputy sheriff and thus does not yet infringe on any actual duties Miller might one day hold as a reserve deputy.

The Court recognizes, however, that "[a] colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." *Doe*, 772 F.3d at 583. Moreover, the ban on nonemergency communications might cause injury to Miller by preventing him from petitioning his government or gaining access to public records. The Court therefore finds that the ban as enacted likely would cause Miller irreparable harm.

### 3.  Balance of Equities and Public Interest

To obtain injunctive relief, a plaintiff also must show that the balance of equities tips in his or her favor (or tips *sharply* in his or her favor, if a court determines that a plaintiff has shown only serious questions going to the merits), and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *Cottrell*, 632 F.3d at 1132. A court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Regardless of the weight given to the importance of First Amendment rights in contemplating these factors, *see, e.g.*, *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020), the situation presented in this lawsuit warrants a closer look at the ban itself. Regarding the first provision of the ban, which prevents Miller from physically attending in-person public meetings, the Court has already decided in his First Amendment claim that the balance of the equities and public interest favor Miller. That portion of the ban is enjoined, and the Court need not discuss it under Miller's retaliation claim.[7]

Regarding the other two provisions of the ban, the question is *what*, exactly, the ban prevents Miller from doing. C911 premises are not open to the general public and are located behind a locked and monitored gate; members of the public can only gain entrance during the times in which a room on the premises is open for a public meeting. Second Fletcher Decl. ¶¶ 3-4. There is, therefore, no effect to the portion of the ban restricting Miller from the premises,

---

[7] The Court reiterates that Miller does not challenge the constitutionality of fully remote meetings, nor does Miller argue *in his motion* that Miller's protected speech was a substantial or motivating factor for C911 to hold its public meetings entirely online.

because all members of the general public are prevented from entering the premises other than during public meetings.[8] The Court has already concluded that the portion of the ban restricting Miller from public meetings will be enjoined.

Miller contends that other public entities, such as Columbia River Fire and Rescue, occasionally hold public meetings on C911 property, and he desires to continue attending these meetings going forward. Third Miller Decl. ¶ 12. Miller argues that the ban might prevent him from attending public meetings other than those held by C911. At oral argument, however, Defendants clarified that Miller may attend those other public meetings and has not been excluded from attending any public meetings on C911 premises. The Court sees no further conflict on this issue that requires resolution now.

Regarding the ban's restriction of Miller's communications to employees, the ban must avoid infringing on Miller's ability to seek public records and to petition the government. For the former, the ban states: "[C911] will *respond* to written public records requests in writing in the ordinary course." Compl. Ex. 6 (emphasis added). It is silent, however, as to how Miller should *submit* public records requests. Currently, Van Meter is handling all public records requests. *See* Suppl. O'Kasey Decl. ¶ 3. For the latter, the ban offers no specific protection for Miller for any petitioning activity. The equities tip sharply in Miller's favor to allow him to engage in these activities.

For other general activity covered by the ban, Miller has no serious assertion of injury from being prevented from contacting individual C911 employees who do not wish to be contacted by him. At oral argument, Miller concurred that complying with a ban on text

---

[8] During the hearing, Defendants clarified that unless and until Miller enters the gate, Miller is not on C911 property and thus would not be subject to a trespass action by C911 or arrested for trespass.

messages, phone calls, and emails to specific C911 employees is not an arduous burden. The balance of equities on this narrow issue favors Defendants.

Similarly, public interest considerations support Defendants if the ban is sufficiently narrowed to prevent contact with individual employees. If Miller violates the ban, C911 states that Miller "will be subject to civil or criminal actions." Compl. Ex. 6. If a C911 employee intends to pursue a civil lawsuit or seek a stalking order against Miller based on unwanted communications, for example, federal injunctive relief in this lawsuit should not prevent that action.

In sum, a narrowly tailored ban prohibiting Miller from contacting specific C911 employees would not impose a significant hardship on Miller. Miller has no right to contact specific C911 employees or access non-public property outside of public meetings. A narrowly tailored ban does not prevent Miller from petitioning C911 or expressing his views about any proposals to which he objects, so long as he does so in a manner that does not present an unreasonable risk of personal harassment to any specific employee. Accordingly, under a narrowed ban, the balance of equities and public interest tip in favor of Defendants.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Miller's motion for a preliminary injunction (ECF 27).

## PRELIMINARY INJUNCTION

1.      Defendants may not preclude Plaintiff from physically attending any public meetings that the C911 board conducts in person that is otherwise open to the public.

2.      Defendants may not preclude Plaintiff from physically attending any other public, in-person meetings hosted on C911 property.

**3.**      Defendants Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy, and any persons working in active concert with them, may not prohibit Tyler Miller from physically attending any public, in-person meetings on C911 property.

**4.**      Defendants may not prohibit Plaintiff from contacting C911 employees, except for the following specific C911 employees: Chandra Egan and Darnell Hooper. Defendants may, upon a showing of good cause, petition the Court to expand this list to include additional named employees.

**5.**      Defendants may not preclude Plaintiff from petitioning the public body or making public records requests in the manner specified by Defendants for all members of the public.

**6.**      In the interest of justice, Plaintiff need not provide any security, and the Court waives all requirements under Rule 65(c) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED**.

DATED this 18th day of May, 2023.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge