Clifford S. Davidson, OSB No. 125378
csdavidson@swlaw.com
Drew L. Eyman, OSB No. 163762
deyman@swlaw.com
SNELL & WILMER L.L.P.
1455 SW Broadway, Suite 1750
Portland, Oregon  97201
Telephone:  503.624.6800
Facsimile:   503.624.6888
Attorneys for Plaintiff Tyler Miller

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| TYLER MILLER, an individual,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>HENRY HEIMULLER, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; BRUCE HOLSEY, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; JEFF FLATT, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; and SHELLEY HENNESSY, in her official capacity as Board Member of the Columbia 9-1-1 Communications District,<br><br>　　　　Defendants. | Case No. 3:23-cv-00293-SI<br><br>PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER |

As discussed below, Plaintiff has, at a minimum, raised "serious questions going to the merits," and the "balance of hardships tips sharply in [plaintiff's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130 (9th Cir. 2011). The Court therefore should grant the requested injunctive relief to permit Plaintiff to attend public board meetings in person in a board room that is separated by locked doors from the rest of the District facility. (Second Miller Decl., ¶ 4.).[1]

## I. THE FIRST AMENDMENT DOES PROTECT IN-PERSON ATTENDANCE OF PUBLIC MEETINGS

"American constitutional jurisprudence, in light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech . . . ."
--*Lehman v. City of Shaker Heights*, 418 U.S. 298, 302 (1974)

Defendants' primary argument is that there is no First Amendment right to attend public meetings in person.[2] But as this Court indicated in *Walsh v. Enge*, a key component of public meetings is "formally or informally meeting with anyone, including elected council members, on the premises."[3] 154 F. Supp. 3d 1113, 1133 (D. Or. 2015).[4] Indeed, Defendants admit that Plaintiff meets with others attending the District's public meetings. (ECF 12, Hooper Decl., ¶ 7 [alleging that Plaintiff "is seen on camera," by someone, "being visibly agitated while meeting

---

[1] Plaintiff does not at this time seek injunctive relief with respect to other aspects of the ban: a prohibition on entering any facility owned or leased by the District, and a prohibition on dialing the District's non-emergency number.

[2] Defendants rest their irreparable harm argument on the asserted non-existence of a First Amendment right to in-person attendance of public meetings. Defendants do not address the balance of hardships or public interest factors.

[3] Again, we do not at this time seek relief from the ban from the premises other than to the extent it precludes in-person attendance at public board meetings.

[4] Although Defendants discuss the *Walsh* opinion in their response, they do not address the key point for which Plaintiff cites it: both informal and formal interactions in public fora matter.

Page 1 – PLAINTIFF'S REPLY ISO TRO

Snell & Wilmer
1455 SW Broadway, Suite 1750
Portland, Oregon 97201
503.624.6800

with other attendees in our parking lot or in the lobby near the front door, sometimes for long periods of time."] [emphasis added].)

The fact that technology now permits remote attendance at public meetings does not lessen the importance of being present in order to fully participate in the public forum—participation that includes assembling with others. Indeed, the prevalence of remote technology makes showing up in person all the more meaningful and that much more expressive of public concern or interest in the District's agenda. As the Western District of Washington has observed in a different First Amendment context, "there is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person." *See Menotti v. City of Seattle*, 409 F.3d 1113, 1174 (9th Cir 2005) (citation omitted).

The First Amendment concerns here are particularly acute given that Plaintiff is an elected official appointed by the city that he serves to act as the liaison for 9-1-1 communications, and liaison to the Columbia County Board of Commissioners—in addition to advocating as a concerned citizen and on behalf of first responders in the city of Scappoose and throughout Columbia County.

The case at bar resembles *Kugler v. Bd. of Ed. of the City of Chicago*, No. 16 C 8305, 2017 WL 3581176 (N.D. Ill. Aug. 18, 2017). There, the Chicago Board of Education restricted Kugler's access to Chicago Public Schools property because of allegedly threatening conduct. Here is one example of plaintiff's alleged conduct in that case:

> [I]n December 2014, Kugler participated in a grievance hearing at Manley Career Academy ("Manley") at which Principal Trista Harper ("Harper") was present. During the course of the hearing, Kugler yelled at Harper and exhibited what she considered to be an intimidating tone and body language. When Harper asked him to act professionally and look at her when speaking to her, Kugler replied, "I don't have to look at you," and asked, "I mean, who are you?" He then banged his fist on a desk and said, "What are you

> going to do about it?" Harper, who was upset and felt threatened, "thought at the time maybe [she] should get security because [she] thought that maybe [Kugler] ... wanted to fight or something," having never experienced such conduct in a professional setting. She reported Kugler's conduct to the Board's law department. Following the meeting, she "started to receive an abundance of email harassments" from Kugler.

*Id.* at *1 (citations to evidentiary record omitted). There were additional examples of this type of behavior on Kugler's part. Kugler sued based on denial of access and First Amendment retaliation and moved for an injunction.

As relevant here, the court found that permitting Kugler to attend grievance hearings by phone or teleconference could not cure the First Amendment harm Kugler suffered through physical exclusion:

> "As explained above, Kugler has been indefinitely barred from exercising any First Amendment right on CPS property. The Board's only argument otherwise is that Kugler can still participate in grievance hearings off of CPS property and by telephone or videoconference. This argument fails for two reasons. First, as Kugler explains in his supplemental brief, he cannot attend certain disciplinary meetings that are expected as part of his job as a CTU representative. The Board responds that such meetings were not the focus of the evidentiary hearing, and explains that it is in the process of arranging videoconferencing for these meetings, but neither response changes the fact that, at present, the Board's restrictions prevent Kugler from representing CTU members at disciplinary meetings. And, more importantly, Kugler is barred from expressing himself in-person at grievance hearings for an

> indefinite period, which has unreasonably harmed him for the reasons explained above. This abridgement of his First Amendment freedoms is irreparable and cannot be compensated by monetary damages."

*Id.* at *11 (citations to evidence omitted).

Physical presence at public meetings has an important expressive function. Because of the District's ban Plaintiff cannot now gather with similarly minded individuals and show up on a particular issue—on the sole-source Motorola Solutions proposal, for example. In his capacity as a Scappoose city councilor, Plaintiff encouraged concerned members of the public to attend the February 23, 2023 meeting in which the board members discussed the sole-source Motorola Solutions proposal. (ECF 3, Miller Decl., ¶ 11 & Ex. 5.) Banishing Plaintiff to Zoom prevents Plaintiff from assembling with others—respectfully—at public meetings, infringing his right of assembly. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 557-58 (1980) ("From the outset, the right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen."). Plaintiff wishes to exercise that right, specifically in connection with a serious public issue: the sole-source Motorola Solutions proposal and proposed systems merger with Washington County; he wants to encourage others to join him in meetings and sit across from the directors deciding those issues, even if those who join them at those meetings say nothing, to demonstrate public interest and concern. (Second Miller Decl., ¶ 2.) There is no Zoom-substitute for gathering, in real time, with others, and especially when political discourse is involved.

Being allowed to congregate for any lawful purpose—whether as a show of force in numbers, or simply to engage in spontaneous conversation about public issues with those around him—is just as important to Plaintiff as speaking to the District board or hearing what they have to say. That is particularly true, given that Plaintiff is an elected official, and the 9-1-1 Communications liaison for the City of Scappoose. (Miller Decl., ¶ 3.)

Defendants also do not refute that District board members often keep their cameras off during meetings, which makes it impossible to observe them, to know whether they're even listening, or sometimes to know who is speaking. (Miller Decl., ¶ 16.) Moreover, in order to participate and give testimony, Plaintiff will have to ensure he is in a quiet space with internet access. Each of these presents a further impediment to meaningful participation.

For these reasons and the ones stated in the Motion, the Court should find that the indefinite, total ban of Plaintiff from all in-person District meetings implicates Plaintiff's First Amendment rights.

## II.    THERE IS NO REASONABLE BASIS FOR EXCLUDING PLAINTIFF FROM ATTENDING DISTRICT BOARD MEETINGS IN PERSON

The allegations set forth in Defendants' submitted declarations are blatantly false. (Second Miller Decl., ¶ 3.) Period. A few examples are provided below, but now is not the time to conclusively lay bare all their falsehoods; that will be dealt with later. Suffice it to say, Defendants do not carry their burden of showing a reasonable basis for permanently banning Plaintiff from attending board meetings in person.

### A.    Even if the allegations in Defendants' opposing declarations were true (they are not), the District has not demonstrated that banning Plaintiff forever from the District's public meetings fulfills a legitimate need.

Defendants do not cite any authority for the proposition that it is reasonable for a public body to ban someone from attending a public meeting primarily based on his alleged behavior over seven years before in a different context (while working as a subcontractor for the public body, or as a reserve deputy sheriff). Egan's and Hooper's declarations reveal the purpose of the ban: to prevent Plaintiff either from being reinstated as a reserve sheriff or to prevent him from accessing the facility in the event he becomes one. (*See* Egan Decl., ¶ 4; Hooper Decl., ¶¶ 2-6.) (Plaintiff intends to address that effort at the appropriate time, which is not now.)

This objective related to Plaintiff's potential employment is wholly unrelated to barring Plaintiff from attending meetings in person in order to fulfill his duties as a City Councilor, and

to advocate as a private citizen. If he is disruptive or otherwise abusive at public District meetings, then he may be excluded from those meetings. (*See* Mot., pp. 10-11, collecting cases.) Of course, he has not behaved in such a fashion and Defendants do not allege that he has.

Moreover, all District board meetings are conducted in the same room: a board room that is separated by locked doors from the rest of the District facility. (Second Miller Decl., ¶ 4.) Thus, even assuming the truth of Defendants' submitted declarations for the sake of argument, the concerns Defendants express about some ill-defined fear of him wandering the halls are unfounded and excluding him from in-person meetings is not reasonable.

**B.     The allegations against Plaintiff, on which Defendants rely for banning Plaintiff, are false. Defendants' ban is unreasonable (and, Plaintiff suspects, pretextual).**

In support of their banning Plaintiff, Defendants rest primarily on conduct that allegedly occurred in 2016 or 2017, when Plaintiff was a subcontractor for the District. (*See* Second Miller Decl., ¶ 5.) Plaintiff categorically denies harassing or bullying anyone at the District, whether during his time as a subcontractor, reserve deputy sheriff, or otherwise. (*Id.*, ¶ 6.) The text messages attached to the Egan Declaration are an incomplete account of the bawdy relationship between Plaintiff and Egan, which was mutual and never harassing. So that the Court may observe the full context of the messages attached to Egan's declaration, Plaintiff includes with this reply the complete thread from which Defendants plucked their excerpts. (*Id.*, Ex. 1.) Egan produced the text messages in response to a subpoena in separate litigation. (*Id.*, ¶ 7.)

Multiple pieces of evidence cast doubt on the credibility of Defendants' claimed basis for banning Plaintiff and the allegations contained in the declarations Defendants have submitted. First, during another litigation, Egan testified at her deposition on February 4, 2020—prior to any COVID-related pause on in-person meetings—that she stopped being on "friendly terms" with Plaintiff because she wanted to separate her personal life from her professional life, not because of any untoward behavior or triggering event:

Q: When did you first meet Mr. Miller?

> A: I don't remember.
>
> Q: Do you remember the circumstances of when you first met him?
>
> A: He was a reserve deputy and I was a dispatcher.
>
> Q: At any time did you consider Mr. Miller a friend?
>
> A: No.
>
> Q: Were you ever on friendly terms with him?
>
> A: Yes.
>
> Q: Are you still on friendly terms with him?
>
> A: No.
>
> Q: And why not?
>
> A: I chose to start making my personal life and my professional life separate.
>
> Q: Is there anything that triggered the – any instance that triggered a termination of considering Mr. Miller someone that you're on friendly terms with?
>
> A: No.

(Second Miller Decl., ¶ 8 & Ex. 2.)

<u>Second</u>, Plaintiff is openly gay—as Egan knew. (Second Miller Decl., ¶ 9.) Although a gay man is capable of offending a woman, Plaintiff's sexual orientation at a minimum contextualizes the communications.

<u>Third</u>, Plaintiff has attended numerous meetings in person, without incident, since the text message thread with Egan began on October 22, 2015. (Second Miller Decl., ¶ 10.) From October 22, 2015 to April 23, 2020, the date District meetings went virtual only due to COVID, Miller attended over 70 District meetings in person.[5] (*Id.*) From the last text message dated

---

[5] The meeting dates, the date on which the meetings became virtual-only, and the date on which in-person meetings resumed, are available on the District website, https://www.columbia911.com/meetings.

January 25, 2017 until virtual only, Plaintiff attended 55 District meetings in person. (*Id.*) The District resumed in-person meetings on March 31, 2022. (*Id.*) Between that date and February 23, 2023, Plaintiff attended 15 in-person meetings—all without incident. (*Id.*).

Fourth, the City Attorney for the City of Scappoose has had multiple phone calls during the past two months with Michael Peterkin, who is outside counsel to the District and the author of the Letter informing Plaintiff that he was banned. At no point during those phone calls did Peterkin raise with the City Attorney any concerns related to Plaintiff's behavior, or his actions during public meetings. (Watts Decl., ¶¶ 2-3.) Phone calls during that time would have been an excellent time to raise such concerns, given that Peterkin and the City Attorney already were exchanging correspondence regarding Plaintiff's advocacy in connection with the sole-source Motorola Solutions proposal. (*See* First Miller Decl., Exs. 2 through 4.)

Fifth, to the extent that Plaintiff is alleged to have made comments, or exhibited improper behavior, while communicating telephonically with on-duty dispatchers, such communications would have been through a recorded line. (Second Miller Decl., ¶ 11.) Where are the recordings? And given his familiarity with the dispatch center, why would Plaintiff risk being recorded making such statements?

Sixth, Ms. Hooper's allegations concerning misuse of CJIS, CAD and other systems are quite serious. Such misuse is required to be reported, yet that never happened. (Second Miller Decl., ¶ 12; Hald Decl., ¶¶ 10, 12.) Why? Because the allegations are untrue. (*Id.*) At the same time, it is clear that Hooper knew well how to complain (Hald Decl., ¶ 8).

And finally, as documented in the declarations submitted with this reply brief, multiple public safety and other public officials can attest to the lack of any indication of harassment, bullying, or other untoward behavior. (Declarations of Hald, Watts, McHugh.) Indeed, several declarants note that he is respectful and well-behaved during public meetings. (Watts Decl., ¶ 4; McHugh, ¶¶ 3-7.)[6]

---

[6] If the Court would like to view video of Plaintiff testifying before the District board, Plaintiff is happy to submit footage to the Court.

Page 8 – PLAINTIFF'S REPLY ISO TRO

Defendants thus cannot satisfy their burden "to justify the restriction" on Plaintiff's speech. *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

## III.   EVIDENTIARY OBJECTIONS

When ruling on a preliminary injunction, the Court "may give even inadmissible evidence some weight, when doing so serves the purpose of preventing irreparable harm." *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The implication is that the Court should relax evidentiary standards in favor of the movant where appropriate, but not the non-movant.

**Hooper Declaration**: Paragraph 2 lacks foundation. The first two sentences of paragraph 3 lack foundation. The third sentence of paragraph 3 is hearsay to the extent he relays what Plaintiff purportedly said. The final sentence of paragraph 3 is irrelevant. The final sentence of paragraph 4 is hearsay. Paragraph 5 lacks foundation. The third sentence of paragraph 6 is hearsay. The first sentence of paragraph 7 lacks foundation, especially because Hooper says Plaintiff "is seen on camera," not that Hooper sees him on camera. Unless Hooper is the one allegedly seeing Plaintiff on camera, his characterization of Plaintiff's conduct allegedly seen on camera lacks foundation. The final two sentences of paragraph 7 lack foundation.

**Fletcher Declaration**: The first sentence of paragraph 3 is hearsay. The first sentence of paragraph 4 lacks foundation as to their concerns. Paragraph 5 lacks foundation. Paragraph 7 lacks foundation. Paragraph 8 lacks foundation. Paragraph 9 lacks foundation. It is one thing to say what the agenda item was and whether it passed, but quite another to explain the motivation for the vote.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV. CONCLUSION

For the foregoing reasons, the Court should grant the requested injunction.

Dated: March 9, 2023                        SNELL & WILMER L.L.P.

                                            By /s/ Clifford S. Davidson
                                            Clifford S. Davidson, OSB No. 125378
                                            Drew L. Eyman, OSB No. 163762

                                            Attorneys for Plaintiff

4883-3277-1157