# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TYLER MILLER**, | Case No. 3:23-cv-293-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **HENRY HEIMULLER**, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **BRUCE HOLSEY**, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **JEFF FLATT**, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **SHELLEY HENNESSY**, in his official capacity as Board Member of the Columbia 9-1-1 Communications District; and the **COLUMBIA 9-1-1 COMMUNICATIONS DISTRICT**, an Oregon municipal corporation, | |
| Defendants. | |

Clifford S. Davison and Drew L. Eyman, SNELL & WILMER LLP, 601 SW Second Avenue, Suite 2000, Portland, Oregon, 97204. Of Attorneys for Plaintiff.

Karen O'Kasey, HART WAGNER LLP, 1000 SW Broadway, Suite 2000, Portland, Oregon, 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Tyler Miller (Miller) brings this action against the Columbia 9-1-1 Communications District (District or C911) and Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy in their official capacities as board members of the District. Miller seeks relief under 42 U.S.C. § 1983, alleging (1) violations of his First Amendment right to expression and right to expressive association, and (2) retaliation in violation of the First Amendment. Miller also alleges a violation of Oregon Revised Statutes (ORS) § 192.630(4). Before the Court is Miller's Motion for Partial Summary Judgment (ECF 94). For the reasons explained below, the Court grants in part and denies in part Miller's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

The District is the entity in Columbia County that answers 9-1-1 calls and dispatches public safety responses. The Board of Directors (Board) is the governing body of the District. Miller is a resident of Scappoose, Oregon, a town located in Columbia County. From 2016 to 2017, Miller worked as a consulting subcontractor for the District. Second Miller Decl. ¶ 5 (ECF 69). In 2020, Miller was elected to the Scappoose City Council, which appointed Miller as their liaison to the District. First Miller Decl. ¶ 3 (ECF 3); Third Miller Decl. ¶ 10 (ECF 76). Miller has attended more than 100 public District meetings since 2015. First Miller Decl. ¶ 5. Miller attended more than 70 District meetings in person between October 22, 2015 and April 23, 2020, at which point the District meetings switched to an all-virtual format (sometimes referred to in this Opinion and Order as "virtual-only" meetings) during the COVID-19 pandemic. The District resumed holding in-person meetings on March 31, 2022, and Miller has attended 15 in-person meetings since then. Second Miller Decl. ¶ 10.

### A. Miller's Opposition to C911 Proposals

At the District meeting on January 11, 2023, the Board discussed two proposals: (1) allowing Motorola to submit a sole source contracting proposal, and (2) merging the Columbia County emergency communications system with Washington County's system. First Miller Decl. ¶ 6 (ECF 3). In connection with the two proposals, the Board passed Resolution 2023-001. *See* First Miller Decl. Ex. 5 (ECF 3-1 at 14-15) (resolution text). Resolution 2023-001 directed the District to engage with Motorola and Washington County and, afterward, to present to the Board a sole source proposal from Motorola for the District's new public safety radio system (the Proposals). *See id.*

Miller opposed the Proposals and spoke out against them at least a dozen times before February 2023. Third Miller Decl. ¶ 2 (ECF 76). After the District meeting on January 11, 2023,

Miller requested a private meeting with a Board member, who did not reply; Miller then emailed

several other Board members, stating his concerns about the Proposals. First Miller Decl. ¶ 7;

Ex. 1 (ECF 3-1 at 1-2) (email).

On January 18, 2023, the District communicated through its outside council, Michael

Peterkin, to the Scappoose City Council and the Mayor of Scappoose, Joe Backus, requesting

that Miller refrain from further comment and criticism of the Proposals until after the Board

could complete its evaluation. First Miller Decl. Ex. 2 (ECF 3-1 at 3-4). The email was

forwarded to Scappoose City Attorney Peter Watts who responded later that day, noting that

community members had expressed questions and concerns about the radio system procurement

process. First Miller Decl. Ex. 3 at 1 (ECF 3-1 at 5). On January 20, 2023, Peterkin contacted

Watts, clarifying the early stage of the procurement process and requesting that Miller not

contact the District directly. First Miller Decl. Ex. 4 at 1 (ECF 3-1 at 7). Watts and Peterkin had

several phone calls during January and February 2023. Watts Decl. ¶ 2 (ECF 71). At no point

during these calls, however, did Peterkin raise with Watts any concerns related to Miller's

actions during District meetings or his behavior generally, other than Miller's comments and

criticisms described above relating to the Board's decisions. *See id.* ¶ 3. Mayor Backus met with

Michael Fletcher, the District's Executive Director, on February 1, 2023; Fletcher also did not

report any concerns about Miller to Mayor Backus. Backus Decl. ¶¶ 2-3 (ECF 77).

On February 17, 2023, Miller posted his concerns about the Proposals on his "Tyler

Miller: Scappoose City Council" Facebook page. First Miller Decl. Ex. 5 at 13 (ECF 3-1

at 11-13). Miller urged residents to attend the District meeting on February 23rd and to oppose

the Proposals. Miller also stated that three seats on the Board were up for election on May 16,

2023. *Id.*

At the February 23rd District meeting, the Board voted to ban Miller from attending District meetings in person. Peterkin then sent Miller a letter notifying Miller that he was not permitted to enter the District's premises or property. First Miller Decl. ¶ 12; Ex. 6 (ECF 3-1 at 16). The District purported to justify its ban on the grounds that Miller's past behavior had "created a hostile work environment," implying that Miller had sent "sexually explicit images" to District employees. The District threatened Miller with legal action if he violated this ban. *Id.* (terms of the ban). The District sent a copy of the letter to the Scappoose City Attorney and to local law enforcement agencies. *Id.* The District also explained to Miller that the District would provide an access link so that Miller could watch future District meetings remotely and make remote presentations. *Id.*

## B. Employee Complaints

In February 2020, District employee Chandra Egan participated in a deposition related to a different lawsuit brought by Miller against other District employees.[1] At her deposition on February 4, 2020, Egan testified that she stopped being on "friendly terms" with Miller because she wanted to separate her personal life from her professional life, adding that nothing had triggered this shift in their relationship. Egan Dep. Tr. 8:16 - 9:12 (Second Miller Decl. Ex. 2 (ECF 69-2)). Egan had shared with Fletcher copies of portions of text messages between Egan and Miller between 2016 and 2017, some of which Egan stated that she had found harassing and intimidating at the time. Fletcher Decl. ¶ 3 (ECF 54). Fletcher acknowledges that in 2020, he saw the 2016 and 2017 text messages between Egan and Miller. *Id.*

According to Egan, on or around January 3, 2023, Egan brought to Fletcher's attention her concerns about Miller's past behavior. Egan Decl. ¶ 4 (ECF 55). Egan had become aware

---

[1] That lawsuit, styled as *Miller v. Watson*, No. 3:18-cv-562-SB (D. Or.), was dismissed.

that Miller might seek reinstatement as a reserve deputy sheriff for Columbia County, which could give Miller access to the District's building and communication systems. *Id.*

Fletcher also states in his declaration that other employees came to him in late 2022 and early 2023 with complaints about Miller's conduct at District meetings and concerns about Miller's potential reinstatement as a reserve deputy sheriff. Fletcher Decl. ¶ 4 (ECF 54). According to Fletcher, District employees Egan, Dannell Hooper, and unspecified others reported to Fletcher that they were "fearful and concerned about attending board meetings as required by their job duties because of Miller's presence at the board meetings and his behavior after the meetings." *Id.* ¶ 6. Hooper adds that District staff avoid Miller when he attends public meetings, and Hooper will rearrange furniture to separate herself from Miller during those meetings. Hooper Decl. ¶ 6 (ECF 56). She also states that Miller has pushed the podium "to a position to confront staff and the board members." *Id.* According to Hooper, staff feel unsafe after the meetings conclude when Miller remains on District property to speak with other attendees. *Id.* ¶ 7. Egan explained that she now attends District meetings remotely to avoid Miller because she is "fearful for [her] personal safety when he is present" and she states that she once had an "escape plan" from the building in case Miller's behavior turned violent. Egan Decl. ¶¶ 5-6. Other declarants, however, have stated that Miller is respectful and well-behaved during District meetings. *See* Watts Decl. ¶ 4 (ECF 71); McHugh Decl. ¶¶ 4-6 (ECF 70).

Hooper also reported concerns about Miller's conduct outside of District meetings. Hooper states that Miller misused emergency communication systems to harass and intimidate dispatchers when Miller had served as a reserve deputy sheriff. Hooper Decl. ¶ 2 (ECF 56). According to Miller, however, all District emergency, non-emergency, and administrative telephone lines are recorded and reporting any misuse of these systems is required, but there

were never any such reports or complaints made about such misuse by him. Second Miller Decl. ¶¶ 11-12 (ECF 69); *see also* Hald Decl. ¶¶ 10-13 (ECF 72).

Aside from concerns raised by Egan and Hooper, Heather Van Meter's investigative report was prompted by anonymous complaints about Miller. Van Meter Decl. ¶¶ 1, 3 (ECF 66). Van Meter, a lawyer from Bullard Law who represented the District in November 2021, interviewed five employees in January 2023 and discussed her conclusions and recommendations to the District in a report issued on February 6, 2023. *Id*. ¶¶ 1, 4; *see also* Van Meter Decl. Ex. 2 at 1 (Van Meter Report) (ECF 42-1). The report discusses Miller's text messages with Egan and other communications with employees, alleged intimidation and harassment attributed to Miller, and personal safety and retaliation concerns. *See generally* Van Meter Report. Based on the employee interviews and Miller's other past dealings with the District, Van Meter recommended that the District restrict Miller's communication to one designated phone or email address and restrict his access to District property and public meetings, among other recommendations. *See id.* at 13-17. Van Meter states that during her investigation, she was unaware of Miller's attendance at the January 11, 2023 District meeting or Miller's February 17, 2023 Facebook post. Van Meter Decl. ¶ 3 (ECF 66).

Miller states that he was unaware of any complaints about him made by Egan or Hooper, or that the District had conducted an investigation into the complaints. Third Miller Decl. ¶ 9 (ECF 76). Miller presents declarations from past colleagues who describe their personal interactions with Miller as well as his reputation in the community. *See, e.g.*, Smith Decl. ¶¶ 3-6 (ECF 78) (describing interactions with Miller as "positive and professional."). Former District employees who interacted with Miller in his capacity as a reserve deputy sheriff state that they do not recall any time when Miller was rude, harassing, or unprofessional to anyone, and that

Miller was generally well-liked and respected. *See* Jenkins Decl. ¶¶ 4-7 (ECF 85); Copeland Decl. ¶¶ 4-9 (ECF 84).

## C. Temporary Restraining Order and Preliminary Injunction

On March 1, 2023, Miller filed a motion for a Temporary Restraining Order (TRO) in response to Defendants' ban on Miller's in-person attendance at District meetings. ECF 2. After a hearing, the Court granted Miller's TRO, concluding that "Plaintiff may physically attend any public meetings that the C911 board conducts in person that is otherwise open to the public. . . . [And Defendants] may not prohibit Tyler Miller from physically attending any public, in-person C911 meetings." ECF 20 at 16. Miller then moved for a preliminary injunction on the same grounds. ECF 27. On May 15, 2023, the Court granted in part Miller's request for a preliminary injunction.[2] ECF 52 at 17. The Court concluded that "Miller is likely to suffer irreparable,

---

[2] In the Court's Preliminary Injunction Opinion and Order, the Court enjoined Defendants in relevant part as follows:

> Defendants may not preclude Plaintiff from physically attending any public meetings that the C911 board conducts in person that is otherwise open to the public.

> Defendants may not preclude Plaintiff from physically attending any other public, in-person meetings hosted on C911 property.

> Defendants Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy, and any persons working in active concert with them, may not prohibit Tyler Miller from physically attending any public, in-person meetings on C911 property.

> Defendants may not prohibit Plaintiff from contacting C911 employees, except for the following specific C911 employees: Chandra Egan and Darnell Hooper. Defendants may, upon a showing of good cause, petition the Court to expand this list to include additional named employees.

PAGE 8 – OPINION AND ORDER

imminent harm if he is denied attendance from any public meetings that the C911 board conducts *in person* that are otherwise open to the public." ECF 52 at 16 (emphasis in original).

## D.  Virtual Meetings

After the Court issued its TRO on March 13, 2023, the Board held four public District meetings remotely by Zoom. During the first of these virtual-only District meetings on March 23, 2023, Miller could not see any other public participants and found it difficult to hear the Board members. Third Miller Decl. ¶ 3 (ECF 76). Miller was only able to see the District executive director and the two Board members on the screen. *Id.* In addition, Miller could only see the Board members when they were speaking and could not witness the reactions of other meeting participants. *Id.* Miller was only able to message the "hosts and panelists" but not any other public attendees. *Id.*

In previous District meetings conducted over Zoom during the COVID-19 public health emergency, the District allowed participants to view and message the other participants. *Id.* ¶ 4. Other members of the public who have publicly opposed the Proposals experienced the same limitations as Miller during the March 23rd meeting. Ryan Decl. ¶¶ 3-4 (ECF 80); Plantz Decl. ¶¶ 2-3 (ECF 79). During the April 27, 2023 virtual-only District meeting, the Board imposed the same virtual restrictions as the March 23rd District meeting. Fifth Miller Decl. ¶ 3 (ECF 95). At subsequent virtual-only District meetings on May 25, 2023, and June 15, 2023, Miller could see the other meeting attendees, but was still only able to message the meeting host. *Id.* ¶ 4.

---

Defendants may not preclude Plaintiff from petitioning the public body or making public records requests in the manner specified by Defendants for all members of the public.

ECF 52 at 22-23.

## DISCUSSION

In Count One of Miller's first claim for relief, Miller asserts that Defendants violated his First Amendment right of expression. In Count Two of Miller's first claim for relief, Miller contends that Defendants separately violated his First Amendment right of expressive association. Miller argues that he is entitled to summary judgment on those Counts. Miller also moves for summary judgment on his second claim for relief, asserting that Defendants violated ORS § 192.630(4)(a) by holding virtual-only District meetings.

### A. First Amendment

Among other things, the First Amendment protects an individual's right "to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Smith v. Ark. State Highway Emps., Loc. 1315*, 441 U.S. 463, 464 (1979). The Constitution's "prohibition on encroachment of First Amendment protections is not an absolute. Restraints are permitted for appropriate reasons." *Elrod v. Burns*, 427 U.S. 347, 360 (1976); *see also Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961) (rejecting "the view that freedom of speech and association, as protected by the First and Fourteenth Amendments, are 'absolutes'" (citation omitted)). For example, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985).

Although infringements on First Amendment protections may be tolerated in appropriate circumstances, the Supreme Court has counseled that the First Amendment "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quotation marks omitted). The Ninth

Circuit has emphasized that "[c]itizens have an enormous first amendment interest in directing speech about public issues to those who govern their city." *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990).

### 1. Right to Expression

In Count One of Miller's first claim for relief, Miller contends that Defendants violated his First Amendment right to expression by banning Miller's in-person attendance at public District meetings. Defendants contend that the District did not ban Miller from expressing himself but merely changed the medium—from in-person to virtual—through which Miller could express himself.

The Supreme Court has articulated a three-part test for evaluating a restriction on expression. This tests directs courts to consider: (1) whether the First Amendment protects the plaintiff's expression; (2) the nature of the forum; and (3) whether the justifications offered for limiting or excluding speech from the relevant forum satisfy the requisite standards. *See Cornelius*, 473 U.S. at 797. The parties agree that District meetings are limited public fora. *See Reza v. Pearce*, 806 F.3d 497, 503 (9th Cir. 2015) ("[C]ity council meetings, where the public has the opportunity to address officers of local government or local government agency, are limited public fora.").

### a. Protected Expressive Conduct

To fall within the protection of the First Amendment, expressive conduct must possess "sufficient communicative elements," meaning that the conduct must have "an intent to convey a particularized message" and there is a great likelihood "that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (cleaned up). In certain circumstances, a person's presence, standing alone, can have sufficient communicative elements to qualify as protected expression. *See, e.g.*, *Brown v. Louisiana*, 383 U.S. 131, 142 (1966)

(holding that black protestors' silent presence in a segregated public facility is protected expression). In other cases, presence alone is not enough to qualify for First Amendment protection. *Cf. Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (concluding that sitting or lying on a sidewalk, in and of itself, is not conduct sufficiently associated with expressive speech to justify a facial attack on an ordinance prohibiting such activity). "[T]he inquiry into whether certain conduct is expressive must be carried out on a case-by-case-basis, examining the circumstances surrounding the conduct in question." *Hightower v. City & County of San Francisco*, 77 F. Supp. 3d 867, 876 (N.D. Cal. 2014) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289-90 (2000) (plurality opinion)); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-14 (1969)).

Miller is a city council member for the city of Scappoose and is tasked with advocating for the city council. In his role as a city council member, he is the council's liaison to the District. Miller has expressed himself through running commentary during District meetings. As a city council advocate, Miller spoke out at least a dozen times against the Proposals, both to the Board and to the District's executive director. Considering Miller's past opposition to the Proposals, even if Miller chose not to speak at District meetings, whether it be virtual or in-person, his presence—particularly when the Proposals are discussed—conveys a particular message to the attendees, the District, and the Board members. Thus, the evidence shows that Miller's presence at District meetings was intended to convey a message and it was likely to be understood as such by those who viewed it. The Court finds that Miller's presence at District meetings possess "sufficient communicative elements" to be protected under the First Amendment. *See Johnson*, 491 U.S. at 404.

### b. Regulating Expression in a Limited Public Forum

In a limited public forum, restrictions on speech "are permissible if they are viewpoint neutral and reasonable in light of the purpose served by the forum." *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1049 (9th Cir. 2003); *see also Kindt v. Santa Monica Rent Control Bd.,* 67 F.3d 266, 271 (9th Cir. 1995) ("[L]imitations on speech at [city council and city board] meetings must be reasonable and viewpoint neutral, but that is all they need to be.").

### i. Viewpoint Neutrality

"Viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (cleaned up); *see also Ctr. for Bio-Ethical Reform, Inc. v. City & County of Honolulu*, 345 F. Supp. 2d 1123, 1136 (D. Haw. 2004) ("'Viewpoint' restrictions . . . are those that limit speech with regard to the particular issue the speaker intends to address, or the opinion the speaker holds regarding that issue."), *aff'd*, 448 F.3d 1101 (9th Cir. 2006).

Neither party's briefing at summary judgment directly addresses whether Defendant's ban on Miller's in-person attendance was viewpoint neutral, but the parties have addressed this issue at the TRO and preliminary injunction stage. Although the ban targets only Miller and does not apply to other members of the public, Defendants contend that the motivation for the District's ban on Miller's in-person attendance at District meetings is related to the purported safety concerns he poses to other attendees—not because of his views on the Proposals or any other subject. Miller, on the other hand, categorically rejects Defendants' representation about why the District banned him. Based on this conflicting evidence, there is a triable issue as to whether Defendants' in-person ban is viewpoint neutral.

### ii. Reasonableness

Because Miller may prevail on summary judgment by showing that there is no genuine issue of fact on the issue of the reasonableness, the Court next addresses the reasonableness of Defendants' in-person ban against Miller. A restriction on protected speech must be "reasonable in light of the purpose served by the forum." *Reza*, 806 F.3d at 504 (quotation marks omitted); *see also Healy v. James,* 408 U.S. 169, 180 (1972) ("First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." (quoting *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 506 (1969) (alteration in *Healy*)). "There is no requirement that a governmental regulation of a limited public forum be the 'most reasonable' or the 'only reasonable' limitation on the forum." *Cogswell v. City of Seattle*, 347 F.3d 809, 818 (9th Cir. 2003). Moreover, reasonableness in this context "is not the legal equivalent of narrow tailoring or least restrictive means." *Flint v. Dennison*, 488 F.3d 816, 834-35 (9th Cir. 2007). In a limited public forum the "inquiry into the reasonableness of restrictions takes into account whether the restrictions imposed leave open alternative channels of communication." *Reza*, 806 F.3d at 504. The government's "failure to select . . . simple available alternative[s] suggests" that a restriction is not reasonable. *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996) (quoting *Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 161 (9th Cir. 1993) (alterations in *Tucker*)).

Miller analogizes this case to *Walsh v. Enge*, 154 F. Supp. 3d 1113 (D. Or. 2015), and argues that a prospective ban on Miller's in person attendance is unreasonable as a matter of law. In *Walsh*, Walsh challenged a 60-day exclusion from Portland City Hall public meetings and property after Walsh had engaged in disruptive conduct during a city council meeting. The city government justified this exclusion on grounds that Walsh had violated the Rules of Conduct for City of Portland Properties and that his behavior created an unsafe and hostile environment for

City employees and visitors conducting City business. *Id.* at 1122. Walsh could participate in the City Council proceedings during the period of exclusion in specific ways: "he could view City Council meetings live online, submit written comments on the posted agenda to the Council Clerk before meetings, and schedule appointments with other City offices, which the offices might request take place at locations other than City Hall." *Id.* The Court granted summary judgment to Walsh, holding that the ordinance that authorized his exclusion was unreasonable in light of purpose of the limited public forum. *See id.* at 1134.

Relying on *Walsh*, the Court concluded in its Opinion and Order at both the TRO and preliminary injunction stage that "even if the factual allegations made by C911 against Miller are true, a *prospective* ban that targets Miller's speech is unreasonable." ECF 20 at 13 (TRO Opinion and Order); ECF 52 at 14 (Preliminary Injunction Opinion and Order) (emphasis in originals). Miller urges the Court to adopt this conclusion as to the reasonableness of the Defendants' ban on Miller's in-person attendance at summary judgment. When deciding a motion for summary judgment, however, a district court is not bound by its earlier findings at the preliminary injunction stage. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128 (9th Cir. 2004) ("Decisions on preliminary injunctions require the district court to assess the plaintiff's likelihood of success on the merits, not whether the plaintiff has actually succeeded on the merits. . . . [T]he general rule [is] that decisions on preliminary injunctions are not binding at trial on the merits, and do not constitute the law of the case[.]" (cleaned up)).

The facts of this case are sufficiently distinguishable from *Walsh* to preclude a straightforward application of *Walsh*'s analysis at summary judgment. In *Walsh*, the prospective ban was unreasonable in part because the city council could have excluded Walsh if (or when) he became disruptive (*i.e.*, after the "harm" occurred). Here, in contrast, viewing the record in the

light most favorable to Defendants, there is a factual dispute about whether and when Miller's presence at District meetings causes harm. A reasonable factfinder could conclude that the harm to the Defendants' interest in public safety and the safety of District employees occurs as soon as Miller is present in attendance at an in-person District meeting. A reasonable factfinder could also conclude that Miller's presence at District meetings causes no harm to the Defendants' identified interest. The factual determination about whether and when the harm occurs affects the reasonableness of the restrictions on Miller's in-person attendance. Because "reasonableness becomes a question of law appropriate for determination on motion for summary judgment when only one conclusion about the conduct's reasonableness is possible," *see West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 351 (9th Cir. 1989), the Court declines to grant summary judgment to Miller on Count One of his first claim for relief.

### 2. Right to Association

In Count Two of Miller's first claim for relief, Miller contends that Defendants' ban on his in-person attendance at District meetings, and the later shift to virtual-only meetings, violated Miller's First Amendment right to association. Miller argues at summary judgment that the First Amendment right to association protects both Miller's in-person attendance at District meetings and protects against the restrictions imposed by Defendants' during the virtual-only District meetings. Defendants argue that Miller has no constitutional right to require the District to hold its public meetings in-person.

#### a. Expressive Association Test

The First Amendment protects, among other rights, the right to freely associate and assemble. *See* U.S. Const. amend. I; *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (explaining that the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others").

"The Constitution guarantees freedom of association . . . as an indispensable means of preserving other individual liberties." *Roberts*, 468 U.S. at 618. "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts*, 468 U.S. at 622). "The right to associate for expressive purposes is not, however, absolute." *Roberts*, 468 U.S. at 623. The right to expressive association "can be infringed upon if that infringement is: (1) unrelated to the suppression of expressive association; (2) due to a compelling government interest; and (3) narrowly tailored." *Givens v. Newsom*, 459 F. Supp. 3d 1302, 1314 (E.D. Cal. 2020) (citing *Roberts*, 468 U.S. at 623). Additionally, "[p]arties bringing an expressive-association claim under the First Amendment must demonstrate that they are asserting their right to associate 'for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id.* (quoting *Roberts*, 468 U.S. at 618).

Viewing the facts in the light most favorable to Defendants, the record reflects a triable issue of fact on the first and second steps of the above-described test. The parties dispute whether the District's in-person ban and the later shift to virtual-only meetings were intended to chill Miller's right to associate with other concerned, likeminded citizens, or whether the District's actions were motivated only by District employees' safety concerns. This conflicting evidence gives rise to a factual dispute not suitable for determination at summary judgment.

The expressive association test, however, requires that the state actor satisfy all three parts to survive summary judgment. Accordingly, the Court discusses the "narrowly tailored"

requirement first in the context of Defendants' in-person ban, and second, in the context of the virtual restrictions associated with the shift to all-virtual District meetings.

### b. "Narrowly Tailored" Requirement

An infringement on expressive association satisfies the "narrowly tailored" requirement when furtherance of the identified compelling state interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Defendants do not expressly argue that the ban on Miller's in-person attendance at District meetings is narrowly tailored to protecting the District's compelling interest, or that their compelling interest cannot be achieved through significantly less restrictive means. Defendants have, however, submitted evidence of District employees' legitimate concerns about Miller's presence at District meetings. As explained above in the Court's discussion of reasonableness, there is a factual dispute about whether and when Miller's presence causes harm at District meetings. The determination about whether the ban on Miller's in-person attendance is narrowly tailored is necessarily informed by a factual determination about the harms at issue in this case. Thus, the Court finds that there is a triable issue as to whether the Defendant's ban on Miller's in-person attendance is narrowly tailored. Accordingly, the Court declines to grant summary judgment on this aspect of Count Two of Miller's first claim for relief.

Miller also moves for summary judgment on the ground that Defendants infringed his right to expressive association during the virtual-only District meetings held on March 23rd, April 27th, May 25th, and June 15th. According to Miller, Defendants restricted him from associating with other participants in various ways during the virtual-only meetings. For instance, Miller offers evidence that during the March 23rd virtual-only District meeting: (1) the District blocked Miller from seeing other participants' video; (2) Miller was only able to see the District executive director and two Board members; (3) the video of feed showed only one Board

member while they were speaking, which hindered Miller's ability to witness the reactions of

fellow attendees; (4) Miller could not message other attendees for much of the meeting and after

the public comment section was closed; (5) the District changed the meeting settings halfway

through the meeting so that Miller could only message the meeting hosts and panelists but not

the attendees; and (6) the video feed would not show which members of the public were

speaking. Miller also states that the March 23rd virtual-only District meeting was the first

meeting—including when District held virtual-only meetings because of the COVID-19

emergency—that the District imposed these heightened virtual restrictions.[3] Miller states that

during the pandemic, meeting participants could see those in attendance and could use the chat

function to message other participants directly and collectively. Miller states that the District

meeting held on April 27th was subject to the same heightened virtual restrictions as the

March 23rd meeting.[4] Miller explains that during the May 25th and June 15th virtual-only

District meetings, Defendants removed one of the heightened restrictions imposed during the

March and April meetings so that Miller could see the other meeting attendees, but contends that

he was still unable to message any attendee or participant other than the meeting host.

    The question before the Court is whether Defendants' restrictions on virtual meeting

participants—particularly when juxtaposed against the less-restrictive virtual meeting settings

---

[3] Defendants admitted in their Answer that "in March of 2023 the district changed to a different Zoom account that allowed the moderator to mute participants and changed the chat feature so that the chats only went to the moderator." ECF 92. This admission may be considered at summary judgment. *See, e.g.*, *Am. Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (explaining that "[a] statement in a complaint, answer or pretrial order is a judicial admission").

[4] It is unclear whether Miller also experienced a change in the virtual meeting settings halfway through the April 27th virtual-only District meeting, or whether that occurred only during the March 23rd meeting.

imposed during the COVID-19 emergency—were narrowly tailored to achieve the District's compelling interest in public and staff safety. Defendants fail to address the "narrow tailoring" requirement for the restrictions related to the District's virtual-only meetings, and do not offer any evidence that would create a disputed issue of fact on this issue.

Defendants argue that Miller's "written and/or verbal communication was never restricted in any way." This statement is conclusory and lacks evidentiary support. Defendants assert that "Miller was free to post, write, comment, record, and respond live during meetings to all topics raised during the *public comment* sessions." (emphasis added). But Miller does not contend that he was never allowed to comment during the virtual-only meetings—in fact, evidence shows that he could, at certain times, comment and express his views. What Miller argues is that Defendants increased the restrictions on his and other attendees' ability freely to associate, and he offers evidence in the form of a sworn declaration in support of these contentions. Defendants offer no evidence to the contrary.

When considering the District's COVID-19 virtual-only meeting settings, which were less restrictive than those that the District imposed during the four virtual-only District meetings described above, it is clear that the District *did not* use narrowly tailored means to achieve its compelling state interest. Defendants do not offer any evidence to suggest that imposing stricter settings during the virtual meeting made District employees or meeting attendees safer, nor do Defendants provide any justification for the enhanced restrictions. Instead, the evidence suggests that the heightened virtual restrictions served to restrict the participants' ability to freely associate with one another. Accordingly, the Court finds that Defendants violated Miller's First Amendment right of expressive association by imposing heightened restrictions on the March 23,

April 27, May 25, and June 15, 2023 virtual-only meetings and therefore grants partial summary judgment to Miller on this limited basis.

## B. Oregon Public Meetings Law

Miller also moves for summary judgment on his second claim for relief, asserting that Defendants' virtual-only meetings violated a provision of the Oregon Public Meetings Law,[5] ORS § 192.630(4)(a). This provision contains requirements for the locations in which public body meetings must be held. Defendants raise two arguments in response. First, Defendants argue that the statutorily defined terms applicable to the Oregon Public Meetings Law contained in ORS § 192.610 authorize the District's virtual-only meetings. Second, Defendants argue that a separate provision of the Oregon Public Meetings Law, ORS § 192.670, contains independent authorization for the District to conduct virtual-only meetings.

ORS § 192.630(4)(a), the provision that Miller contends Defendants violated by moving to virtual-only District meetings, states:

> (4)(a) Meetings of the governing body of a public body shall be held:
>
> (A) Within the geographic boundaries over which the public body has jurisdiction;
>
> (B) At the administrative headquarters of the public body;
>
> (C) At the nearest practical location; or
>
> (D) If the public body is a state, county, city or special district entity, within Indian country of a federally recognized Oregon

---

[5] C911 is a district within the meaning of ORS Chapter 198, which defines "district" to include 9-1-1 communications districts. ORS § 198.010(24). A "district" is a "public body" under ORS § 192.610(6). C911, therefore, is a "public body." A "governing body" means "the members of any public body which consists of two or more members, with the authority to make decisions for or recommendations to a public body on policy or administration." ORS § 192.610(5). The Board, therefore, is a "governing body." Thus, both the District and the Board must comply with the Oregon Public Meetings Law.

> Indian tribe that is within the geographic boundaries of this state.
> For purposes of this subparagraph, "Indian country" has the
> meaning given that term in 18 U.S.C. 1151.

As noted, this provision contains requirements for the locations in which public body meetings

must be held, and the locations specified are all physical in nature. The provision's emphasis on

physical locations supports the conclusion that ORS § 192.630(4)(a) does not authorize public

body meetings to be held in a virtual-only setting. This is not the end of the Court's inquiry,

however, and the Court next addresses Defendants' arguments about the statutory authority for

virtual-only District meetings.

### 1. ORS § 192.610

The term "meeting," as used in ORS § 192.610 through ORS § 192.705, "means the

*convening* of a governing body of a public body for which a quorum is required in order to make

a decision or to deliberate toward a decision on any matter." ORS § 192.610(7)(a) (emphasis

added). Effective on September 24, 2023, the legislature added "convening" to the defined terms

applicable to provisions within the Oregon Public Meetings Law. The September 24, 2023

amendments provide that the term "convening" means: "(a) Gathering in a physical location;

(b) Using electronic, video or telephonic technology to be able to communicate

contemporaneously among participants; (c) Using serial electronic written communication

among participants; or (d) Using an intermediary to communicate among participants." ORS

§ 192.610(1). Defendants contend that the effect of this statutory amendment is that any District

meeting held in a virtual-only format is now expressly authorized under the statute.

The Court does not understand Defendants to argue that the September 24, 2023

amendments retroactively authorized Defendants to hold the March 23rd, April 27th, May 25th,

and June 15th District meetings in a virtual-only format. Instead, Defendants argue that "[a]s a

matter of law, any virtual meetings that the district holds in the future are statutorily

permissible." The issue of whether Defendants may hold virtual-only meetings *in the future* is not before the Court, and the Court does not reach that issue here.

### 2.  ORS § 192.670

Defendants further argue that another statutory provision—ORS § 192.670—expressly authorizes the District to conduct Board meetings in a virtual-only setting. ORS § 192.670 provides, in part:

> (1) Any meeting, including an executive session, of a governing body of a public body which is held through the use of telephone or other electronic communication shall be conducted in accordance with ORS 192.610 to 192.705.

> (2) When telephone or other electronic means of communications is used and the meeting is not an executive session, the governing body of the public body shall make available to the public at least one place where, or at least one electronic means by which the public can listen to the communication at the time it occurs. A place provided may be a place where no member of the governing body of the public body is present.

Although these subsections *refer* to public meetings held though the use of telephone and other electronic means, the Court cannot conclude that ORS § 192.670(1)-(2) expressly *authorizes* public bodies to hold meetings in a virtual-only format. Subsection (1) simply contemplates that meetings of public bodies must be in accordance with ORS §§ 192.610 to 192.690 when a meeting is "held through the use of a telephone or other electronic communications." Subsection (2) states that when a public body uses virtual means to conduct meetings, the public body must make available a physical space for the public or grant the public access to the meeting through "one electronic means by which the public can listen to the communication at the time it occurs." Nothing in the plain text of ORS § 192.670(1)-(2) specifically *authorizes* public bodies to hold public meetings by virtual-only means.

In 2021, the Oregon legislature added a new subsection to ORS § 192.670:

(3) All meetings held by a governing body of a public body, excluding executive sessions, must provide to the members of the general public, to the extent reasonably possible, an opportunity to:

(a) Access and attend the meeting by telephone, video or other electronic or virtual means;

(b) If in-person oral testimony is allowed, submit during the meeting oral testimony by telephone, video or other electronic or virtual means; and

(c) If in-person written testimony is allowed, submit written testimony, including by electronic mail or other electronic means, so that the governing body is able to consider the submitted testimony in a timely manner.

This newly added subsection, which became effective on January 1, 2022, contemplates the use of technology to allow attendance at public body meetings virtually and provides parameters and additional rights for public attendees who attend meetings remotely: subsection (3)(a) provides that all public body meetings must provide a virtual means for public attendance; subsection (3)(b) provides that if a public body meeting allows in-person testimony, the public body must allow remote testimony, which indicates that in-person and remote attendees share the same rights; and subsection (3)(c), similarly to subsection (3)(b), provides additional rights for remote attendees. Notably, however, subsection (3) does *not* authorize all-virtual public body meetings. This provision also must be read in "accordance with" ORS § 192.630—which expressly contemplates physical presence, *e.g.*, the geographic location, the administrative headquarters, or the nearest physical location, of public body meetings—and the Court does not read into this provision an implicit authorization for public bodies to hold virtual-only meetings. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) (explaining that under the "Harmonious-Reading Canon," which is a contextual canon, "[t]he provisions of a text should be interpreted in a way that renders them compatible, not

contradictory"). Thus, Defendants' reliance on ORS § 192.670 as authorization for public bodies to hold virtual-only meetings is misplaced.

Further support for the Court's conclusion that ORS § 192.670 does not authorize public bodies to hold virtual-only meetings is found in the now-repealed Oregon House Bill 4212. *See* H.B. 4212, 80th Leg., 2020 First Spec. Sess. (Or. 2020), 2020 Or. Laws First Spec. Session 1. This bill—enacted in response to the COVID-19 emergency—echoes the language in the Emergency Order issued by Governor Kate Brown on April 15, 2020, in which Governor Brown expressly authorized public bodies to hold meetings virtually. *See* Exec. Order No. 20-16. Oregon's House Bill 4212 provides in relevant part:

> Sec. 1. (1) *Notwithstanding ORS 192.610 to 192.690, the governing body of a public body may hold all meetings by telephone or video conferencing technology or through some other electronic or virtual means.* When a governing body meets using telephone or video conferencing technology, or through other electronic or virtual means, the public body shall make available a method by which the public can listen to or observe the meeting. If a governing body meets using telephone or video conferencing technology, or through other electronic or virtual means:
>
> (a) The public body does not have to provide a physical space for the public to attend the meeting; and
>
> (b) If the telephone or video conferencing technology allows the public body to do so, the public body shall record the meeting and make the recording available to the public. This paragraph does not apply to executive sessions.
>
> SECTION 2. *Section 1 of this 2020 special session Act is repealed 30 days after the date on which the declaration of a state of emergency issued by the Governor on March 8, 2020, and any extension of the declaration, is no longer in effect.*

(emphases added). As indicated in Section 1, the legislature authorized public bodies to use virtual-only means to conduct public meetings, notwithstanding the existing provisions in ORS § 192.610 to 192.690. If ORS § 192.610 to 192.690 already authorized virtual-only meetings,

this temporary authorization during the COVID-19 pandemic would not have been necessary, and would not have needed to emphasize that the authorization was "notwithstanding" the current provisions.

As stated in Section 2, however, this bill was to be repealed after the end of the COVID-19 state of emergency. Governor Brown subsequently terminated the COVID-19 emergency order on April 1, 2022, effectively repealing House Bill 4212. Exec. Order No. 22-03. Thus, the Oregon state legislature temporarily authorized public bodies to hold all-virtual meetings through House Bill 4212. House Bill 4212 was thereafter automatically repealed with the recission of Governor Brown's state of emergency declaration. The legislature did not codify the virtual-only authorization in House Bill 4212 and allowed the repeal of this authorization.

For these reasons, the Court concludes that ORS § 192.670 does not authorize Defendants to conduct virtual-only District meetings. Defendants thus violated ORS § 192.630(4)(a) by holding public meetings in a virtual-only format on March 23rd, April 27th, May 25th, and June 15th.  Miller is entitled to summary judgment on his second claim for relief.

## CONCLUSION

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Partial Summary Judgment (ECF 94) as described herein.

**IT IS SO ORDERED**.

DATED this 12th day of March, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge