# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TYLER MILLER**, | Case No. 3:23-cv-293-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **HENRY HEIMULLER**; **BRUCE HOLSEY**; **JEFF FLATT**; **SHELLEY HENNESSY**; and **COLUMBIA 9-1-1 COMMUNICATIONS DISTRICT**, | |
| Defendants. | |

Clifford S. Davidson, Brett E. Applegate, and Drew L. Eyman, SNELL & WILMER LLP, 601 SW Second Avenue, Suite 2000, Portland, Oregon, 97204. Of Attorneys for Plaintiff.

Karen O'Kasey and Zachariah H. Allen, HART WAGNER LLP, 1000 SW Broadway, Twentieth Floor, Portland, Oregon, 97205. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Tyler Miller ("Miller") is an elected member of the Scappoose City Council in Columbia County, Oregon. Miller brings this federal civil rights lawsuit under 42 U.S.C. § 1983 against the Columbia 9-1-1 Communications District (the "District") and four members of the District's Board of Directors in their official capacities. The individual defendants are Henry Heimuller, Bruce Holsey, Jeff Flat, and Shelley Hennessy (collectively, the "Board"). The Court refers to

the District and the Board collectively as the "Defendants." Miller alleges that Defendants

violated his First Amendment rights by banning him from attending District public meetings,

entering District premises, and communicating with District personnel. Now before the Court is

Miller's motion to compel certain documents and testimony over which Defendants are asserting

the attorney-client privilege. For the reasons stated below, the Court finds that by Defendants'

intentional disclosure to Miller of a document containing privileged material that is favorable to

Defendants' position in this lawsuit, Defendants have waived the attorney-client privilege

regarding the subject matter of that disclosure.

## STANDARDS

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that parties "may obtain

discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense and

proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). In many

circumstances, "the attorney-client privilege will protect communications between clients and

their attorneys from compelled disclosure in a court of law." *In re Pac. Pictures Corp.*, 679

F.3d 1121, 1126 (9th Cir. 2012). For the attorney-client privilege to apply, it is essential "that the

communication be made in confidence for the purpose of obtaining legal advice from the

lawyer." *United States v. Gurtner*, 474 F.2d 297, 298 (9th Cir. 1973) (cleaned up). In federal

court, the application of the attorney-client privilege in the adjudication of claims arising under

federal law is governed by federal common law. *See* Fed. R. Evid. 501; *see also United States v.

Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009). The party asserting attorney-client privilege bears the

burden of proving that the privilege applies and has not been waived. *See Ruehle*, 583 F.3d

at 607-08.

## BACKGROUND[1]

Miller is the 9-1-1 Communications liaison between the Scappoose City Council and the District. On February 23, 2023, the Board—through their outside counsel, Michael Peterkin of the law firm Peterkin Burgess—sent Miller a written notice (the "Ban Letter") stating that Miller had been banned from attending (other than remotely) Board meetings of the District that were otherwise open to the public, entering District premises that were otherwise open to the public, and contacting District employees except in an emergency ("the Ban"). Miller alleges that, among other things, Defendants impermissibly retaliated against him based on his exercise of protected speech. Defendants, however, assert that the Ban was a reasonable response to complaints received from District employees that Miller had been harassing them.

The parties have engaged in discovery. Defendants have produced, among other documents, a report prepared by attorney Heather Van Meter ("the Van Meter Report"), along with her notes from her investigation. ECF 42-1. At the time she prepared that report, Van Meter was employed by the law firm of Bullard Law. Van Meter had represented the District as legal counsel since November 2021, providing employment law advice and counsel on public records and meetings. Decl. of Van Meter ¶ 1 (ECF 66 at 1); Van Meter Depo. Tr. 9:14 (ECF 152-1 at 2). In January 2023, the District asked Van Meter to "investigate" an employee complaint recently received by the District that made certain allegations against Miller. Decl. of Van Meter

---

[1] For a more detailed discussion of the background of this case, see the Court's discussion in its Opinion and Orders resolving Miller's motion for preliminary injunction, *Miller v. Heimuller*, 2023 WL 3559529, at *3-5 (D. Or. May 18, 2023), and Miller's motion for partial summary judgment, *Miller v. Heimuller*, 2024 WL 1075272, at *1-4 (D. Or. Mar. 12, 2024).

¶ 3.[2] Van Meter conducted a factual investigation and prepared her report, dated February 6, 2023.

The Van Meter Report is a 17-page memorandum with "Bullard Law" displayed prominently on the upper left-hand corner of each page. *See* ECF 42-1. The author of the report is listed as "Heather Van Meter, Bullard Law." *Id.* at 1. The Van Meter Report first states several relevant definitions from the District's policy regarding "Inappropriate Conduct." *Id.* Then, under a section titled "Purpose of Investigation and Report," Van Meter explains that in preparing the report, she reviewed District policies and practices, applicable law, Miller's litigation history in several lawsuits, and Miller's text messages exchanged with two District employees. *Id.* at 2. Van Meter also notes that she interviewed five District employees as part of her investigation. *Id.* The next section of the Van Meter Report, titled "Policy and Legal Background," discusses the District's relevant workplace violence and harassment policies, and is followed by a section titled "Relevant Statutes," which provides a discussion of applicable Oregon statutory and common law. *Id.* at 2-5. The Van Meter Report next provides additional factual background about Miller and the specific allegations asserted against him. *Id.* at 5-12. After this section, Van Meter discusses the "Impact on District Operations and Personal Liability Issues." She then provides her "Conclusions," which outline the ways in which the District and its Board members might face legal liability if they did not take certain action against Miller. *Id.* at 12-13. Finally, the Van Meter Report concludes with a section—more than three pages long— titled "Recommendations," in which Van Meter presents nine detailed recommendations for the

---

[2] During her deposition, however, when asked whether someone at the District asked her to investigate Miller, Van Meter replied, "No, not specifically." Van Meter Depo. Tr. 11:1-3 (ECF 152-1 at 4). She then explained that the District's employee Chandra Egan sent a complaint to the District and that Van Meter investigated the complaint "pursuant to District policy." *Id.* at 11:4-14 (ECF 152-1 at 4).

District to take "in order to effectively address" her conclusions about Miller and the District's potential legal liability to its employees. *Id.* at 13-17.

At about the same time that Van Meter conducted her investigation and prepared her report, the District's General Counsel (Peterkin) and its Executive Director (Mike Fletcher) exchanged a series of emails[3] regarding Miller. Peterkin also prepared his own memorandum dated February 7, 2023 ("the Peterkin Report"), which he sent to the District's Board with a copy provided to Fletcher.

On February 13, 2023, the Board convened at a special meeting. Van Meter attended by Zoom, as did Peterkin. ECF 152-2. Defendants Holsey, Hennessy, Flatt, and Heimuller—among others, including Fletcher—also attended. *Id.* Holsey testified[4] at his deposition that he saw the Van Meter Report for the first time at that meeting. Holsey Depo. Tr. 58:11-18 (ECF 145-5 at 5). Fletcher removed a copy of the report from a manilla envelope and gave a copy to the Board to read. *Id.* at 58:19-23. After each Board member read the report, it was returned to Fletcher and placed back in the manilla envelope. *Id.* at 58:23-25. All Board members reviewed the Van Meter Report at this meeting. *Id.* at 59:13-17. According to Holsey, he did not keep a copy of the Van Meter Report because "[i]t was confidential." *Id.* at 59:3-8. After the Van Meter Report was returned to Fletcher and placed back in the manilla envelope, "[t]here was some back and forth with [the Board's] attorney . . . Mr. Peterkin." *Id.* at 68:25-69:10; *see also id.* at 60:9-13

---

[3] There are 14 emails with accompanying attachments between Peterkin and Fletcher that Defendants listed on their privilege log. *See* ECF 145-7 at 1-2.

[4] On November 20, 2024, Miller deposed Holsey, who was the president of the Board during the period relevant to this lawsuit. *See* Decl. of Brett E. Applegate ¶ 6. Holsey testified at deposition both as a percipient witness and as an organization designee of the District under Rule 30(b)(6) of the Federal Rules of Civil Procedure. *See* Decl. of Brett E. Applegate ¶ 3 (ECF 145 at 2).

(ECF 145-5 at 7) ("I believe we discussed [banning Miller] with our attorney."). When asked at deposition why the District enacted the Ban, Holsey explained that it was "[b]ecause of the report from Mrs. Van Meter" and nothing else. *Id.* at 69:13-24.[5]

After discussing the Van Meter Report with Peterkin and receiving his advice, the Board decided to adopt the recommendations outlined in the Van Meter Report. *Id.* at 82:8-14. Peterkin drafted the Ban Letter, which he then sent to Miller on February 23, 2023. *See* ECF 3-1 at 16. The contents of the Ban Letter are substantially equivalent to Recommendation No. 5 in the Van Meter Report.

During Holsey's deposition, Miller attempted to ask him about the Board's discussion of the Van Meter Report, which Holsey stated occurred only in the presence of the Board's General Counsel, Peterkin. Defendants' counsel objected on grounds of attorney-client privilege and instructed Holsey not to answer. Defendants also withheld from production the Peterkin Report and the emails exchanged between Peterkin and Fletcher. At the Court's request, Defendants provided the Peterkin Report and the related emails for *in camera* review, and the Court closely reviewed these documents.

In his pending motion, Miller seeks a copy of the Peterkin Report and the related emails between Peterkin and Fletcher. Miller also seeks to compel Holsey and Fletcher—whom Miller deposed in February 2025—to answer questions regarding the Board's discussions on February 13, 2023, about the Van Meter Report, all related comments made at that meeting by

---

[5] Holsey reaffirmed this point throughout his deposition. *See* Holsey Depo. Tr. 16:6-13 (explaining that the Board "relied on the report from Mrs. Van Meter" and, in response to a clarifying question, confirming the Board relied on nothing else); *id.* at 22:12-17 ("We went strictly off the report.").

Peterkin, and the related subject of Board's decision to impose the Ban on Miller. Specifically,

Miller requests an order:

> Compelling Defendants to produce the "report by Michael Peterkin to the board about Ms. Van Meter's investigation" that Defendants have withheld for privilege.
>
> Compelling the production of any documents identified on Defendants' privilege log that fall within the scope of the subject-matter waiver.
>
> Compelling Holsey to answer the questions he was asked during his deposition related to the Board's discussions about (1) the Van Meter Report, (2) whether to adopt the recommendations in the Report, (3) whether to ban Miller from public meetings, (4) whether to enact the Ban, and (5) what should go into the Ban Letter.
>
> Compelling Fletcher . . . to answer those same questions, as well as questions about any related communications he may have had with Peterkin and/or Van Meter.
>
> Compelling Peterkin's deposition on Van Meter's investigation, the Van Meter Report, the Ban, and the Ban Letter.

ECF 144 at 14.

## DISCUSSION

In support of his motion to compel, Miller asserts two alternative grounds: the crime-fraud exception to the attorney-client privilege and the doctrine of subject matter waiver. The Court addresses each in turn.

## A. Crime-Fraud Exception

Miller argues that he is entitled to the Peterkin Report and the Fletcher-Peterkin emails because they fall under the crime-fraud exception to attorney-client privilege. Under the crime-fraud exception, documents subject to the attorney-client privilege "are not privileged when the client consults an attorney for advice that will serve him in the commission of a fraud or crime." *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (quotation marks omitted);

*see also United States v. Zolin*, 491 U.S. 554, 563 (1989) ("It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." (cleaned up)).

A party asserting the crime-fraud exception first must establish "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (cleaned up). Only a "minimal showing" is needed to satisfy this threshold step. *United States v. Christensen*, 828 F.3d 763, 800 (9th Cir. 2015) (quotation marks omitted). Defendants provided the Court with Peterkin's memorandum dated February 7, 2023, and the related emails between Peterkin and Fletcher for the Court's *in camera* review. As noted, these emails are listed on Defendants' privilege log, ECF 145-7 at 1-2, and the Court has reviewed these documents.

A party invoking the crime-fraud exception must satisfy a two-part test to make a prima facie case that the crime-fraud exception applies:

> First, the party must show that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme. Second, it must demonstrate that the attorney-client communications for which production is sought are sufficiently related to and were made *in furtherance of* [the] intended, or present, continuing illegality.

*In re Grand Jury Investigation*, 810 F.3d at 1113 (quotation marks omitted) (emphasis and alteration in original); *see also In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (same), *abrogated on other grounds by Mohawk Indus. v. Carpenter*, 558 U.S. 100 (2009). "The attorney need not have been aware that the client harbored an improper purpose," nor must the planned crime or fraud "have succeeded for the exception to apply." *In re Napster*, 479 F.3d at 1090. The burden of proof by a party in a civil case seeking disclosure of documents

protected by attorney-client privilege or the work-product doctrine under the crime-fraud exception is preponderance of the evidence. *Id.* at 1094-95.

The Court first observes that there is no alleged *crime* at issue in this case. Rather, Miller contends that Defendants violated his constitutional rights. Thus, the "crime" aspect of the crime or fraud exception does not apply. The Court next turns to the question of "fraud." If Defendants engaged with their lawyers in devising a pretext—a form of fraud—by which to ban Miller, the crime-fraud exception might apply.

At the first step of the required prima facie showing, a movant must come forward with more than bare speculation that a defendant engaged in a fraudulent scheme when seeking advice of counsel. *See, e.g.*, *United States v. Laurins*, 857 F.2d 529, 541 (9th Cir. 1988) (affirming district court's finding that the government made a prima facie case that the defendant was committing obstruction of justice based on independent deposition testimony from witnesses who assisted him in boxing up and transporting company documents); *United States v. Chen*, 99 F.3d 1495, 1503-04 (9th Cir. 1996) (affirming district court's finding that there was reasonable cause to believe the defendants used attorneys' services to conceal income tax fraud based on inferences drawn from independent exhibits and affidavit testimony). Here, Miller has not made that showing. He has not produced any evidence—beyond what he alleges is contained within the privileged material—suggesting that Defendants acted fraudulently. Further, based on the Court's *in camera* review of these documents, the Court concludes that they do not evidence pretext or fraud. *Cf. Buddenberg v. Estate of Weisdack*, 711 F. Supp. 3d 712, 807 (N.D. Ohio 2024) (finding that the crime-fraud exception did not apply where *in camera* review revealed "only the ordinary communications" between an attorney and client and contained no evidence

of a "smoking gun establishing the liability of the [defendants]"). Accordingly, the crime-fraud exception does not apply.[6]

## B. Subject Matter Waiver

Miller next argues that he is entitled to see the withheld communications based on the doctrine of subject matter waiver. He argues that the Van Meter Report contains privileged communications and that by disclosing the entirety of the Van Meter Report without any redaction of privileged material, Defendants have intentionally waived attorney-client privilege over the subject matter of that report, which includes the Peterkin Report, the related emails, and the discussion held during the Board meeting on February 13, 2023. Defendants argue that the Court has already rejected Miller's "subject matter waiver" argument in an earlier Order (ECF 34). Miller responds that to the extent that his motion is a motion to reconsider, reconsideration is appropriate based on Holsey's recent deposition testimony. The Court agrees with Miller on this point.

### 1. Motion to Reconsider

Rule 54(b) of the Federal Rules of Civil Procedure provides that any order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The rule, however, does not address the standards that a district court should apply when reconsidering interlocutory orders, and the Ninth Circuit has not established a standard of review. "Rule 54(b) is not a mechanism to get a 'do over' to try

---

[6] The Court expresses no conclusion on whether Defendants' rationale for banning Miller was fraudulent or pretextual and expresses no view on the merits of Miller's claim under the First Amendment. "The [C]ourt simply finds that if what [Defendants] did amounted to fraud, [P]laintiff has not shown that [Defendants] obtained or used the *advice of its counsel* in an effort to further it." *United States ex rel. Bagley v. TRW, Inc.*, 204 F.R.D. 170, 187 n.22 (C.D. Cal. 2001) (emphasis added).

different arguments or present additional evidence when the first attempt failed. Thus, while the limits governing reconsideration of final judgments under Rule 59(e) do not strictly apply, courts frequently invoke them as common-sense guideposts when parties seek reconsideration of an interlocutory ruling under Rule 54(b)." Stephen S. Gensler & Lumen N. Mulligan, 2 *Fed. R. of Civ. P., Rules and Commentary*, Rule 54 (2022).

When reconsidering an interlocutory order, district courts in this circuit have stated:

> Motions to reconsider under Rule 54(b), while generally disfavored, may be granted if: (1) there are material differences in fact or law from that presented to the court and, at the time of the court's decision, the party moving for reconsideration could not have known the factual or legal differences through reasonable diligence; (2) there are new material facts that happened after the Court's decision; (3) there has been a change in law that was decided or enacted after the court's decision; or (4) the movant makes a convincing showing that the court failed to consider material facts that were presented to the court before the court's decision.

*In re Galena Biopharma, Inc. Derivative Litig.*, 2014 WL 5494890 (D. Or. Oct. 30, 2014) (quoting *Lyden v. Nike, Inc.*, 2014 WL 4631206, at *1 (D. Or. Sept. 15, 2014)); *see also Stockamp & Assocs. v. Accretive Health*, 2005 WL 425456, at *6-7 (D. Or. Feb. 18, 2005) (discussing the four factors as established in the local rules of the Central District of California and applied by other district courts within the Ninth Circuit).

The Court finds that new material facts have been presented after its earlier ruling, specifically the November 2024 deposition testimony from Holsey. In his deposition, Holsey provided important context for the Board's decision-making process, including how the Board received the Van Meter Report and that the Board relied strictly and only on the report when approving the Ban. Accordingly, the Court finds that reconsideration of its earlier analysis of subject matter waiver is appropriate.

## 2. Subject Matter Waiver

A party waives its attorney-client privilege by voluntary disclosure of a privileged communication. *United States v. Plache*, 913 F.2d 1375, 1379 (9th Cir. 1990). This type of waiver "occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116-17 (9th Cir. 2020) (quotation marks omitted). Further, "it has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications *on the same subject*." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (emphasis added). Thus, voluntary disclosure of a privileged attorney communication "waiv[es] the privilege on all other communications on the same subject." *Plache*, 913 F.2d at 1380.

The first step of the subject matter waiver analysis is to determine whether the underlying communication—here, the Van Meter Report—was privileged—or contains privileged material in whole or in part. As discussed above, there are two primary hallmarks of privilege: a communication must be: (1) confidential and (2) be made for the purpose of obtaining "*legal* advice." *Gurtner*, 474 F.2d at 298 (emphasis in original). The Court observes at the outset of this discussion that the Van Meter Report was a confidential communication. At his deposition, Holsey not only described the report as "confidential" but also explained that Fletcher provided the Board with the Van Meter Report in a manilla envelope and required the Board to return it to him for placement back into that envelope.

Defendants challenge the second hallmark of privilege by arguing that the Van Meter Report was merely a factual investigation that, albeit confidential, does not provide legal advice.

In support of this argument, Defendants first assert that a factual investigation does not become privileged merely because a lawyer conducted that investigation. The Court agrees. *See, e.g.*, *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged). Therefore, the fact that Van Meter was the District's attorney is not a sufficient basis on which to conclude that the Van Meter Report includes material protected under the attorney-client privilege. Defendants' second assertion is that Van Meter's assignment was merely to investigate employee complaints, not to provide legal advice, and that her "Recommendations" at the end of her report do not change the fact that her report summarized a *factual* investigation.

Here, the Court disagrees with Defendants' position. There is a meaningful distinction between a report of the results of a factual investigation performed by an attorney and a report of a factual investigation performed by an attorney that also includes legal advice. The former might be privileged; the latter certainly is, at least the portion that contains legal advice.

A communication from an attorney to a client may contain both factual and legal information. Indeed, as summarized above, the Van Meter Report contains *both* factual statements (the results of the investigation) and legal advice (the recommendations of what to do to avoid the risk of District and personal liability). The rules of privilege apply differently to each component. The discussion of Miller's background and the harassment allegations were investigative and factual in nature. These statements do not contain legal advice and are not necessarily protected from disclosure under the attorney-client privilege. The latter portion of the Van Meter Report, however, contains a detailed discussion of the District and Board members' potential legal liabilities and nine *legal* recommendations for how the District and the Board may reduce their legal risk. As noted, the Board voted to "adopt" Van Meter's recommendations, and

indeed, Recommendation No. 5 was reflected almost verbatim in the Ban Letter that the Board—

through Peterkin—sent to Miller ten days after the Board meeting that discussed the Van Meter

Report, which contained this legal advice. Therefore, at least those portions of the Van Meter

Report are presumptively protected from disclosure under the attorney-client privilege.

Because the Van Meter Report contained privileged legal advice in the form of legal

analysis and recommendations, Defendants could have redacted the legal advice in that report

when they provided a copy of that to Miller in discovery.[7] In that case, they would have

disclosed to Miller only the factual—and nonprivileged—contents of the Van Meter Report.

Defendants, however, intentionally chose not to take this route. Instead, they voluntarily

provided the entire Van Meter Report to Miller without any legal advice being redacted. Thus,

Defendant voluntarily, intentionally, and expressly waived their attorney-client privilege

---

[7] For example, in *Thomas v. Marshall Public Schools*, the federal court considered the defendants' assertion of privilege over communication between the defendants and an attorney whom they had hired to conduct a factual investigation. 690 F. Supp. 3d 941 (D. Minn. 2023). The defendants disclosed the factual report but asserted the attorney-client privilege over their verbal communications with the attorney about how to *respond* to the investigative findings and conclusions. *Id.* at 950, 954. The court distinguished between an attorney in his capacity as a factual investigator and his capacity as a provider of legal advice. *See id.* at 959. Specifically, the court explained that the attorney's recommendations "stray[ed] into the province of professional advice ordinarily reserved for legal experts." *Id.* at 960. Indeed, "[b]ecause to the extent Defendants discussed these topics with [the investigator] they likely did so in reliance on his legal acumen, the Court cannot comfortably conclude Defendants might just as readily have retained a non-lawyer investigator to serve the same role." *Id.* Similarly, in this case, there is a distinction between Van Meter's purely factual findings and her legal recommendations. Van Meter's legal advice was based on her expertise as a lawyer, and she provided legal advice on how to *implement* her recommended solutions to the problems and risks identified in her factual investigation. Moreover, as in *Thomas*, that Van Meter was an attorney played an important role in giving her report credibility. Holsey testified that he believed the Van Meter Report *because* Van Meter was an attorney and therefore would "do . . . what the law states." Holsey Depo. Tr. 64:17-65:9.

regarding all communications on the same subject matter.[8] In other words, by failing to redact the specific legal advice provided by Van Meter in the Van Meter Report before disclosing that report to Miller in discovery, Defendants have voluntarily waived their attorney-client privilege over communications that concern the same subject matter as Van Meter's recommendations.[9]

**CONCLUSION**

The Court GRANTS Plaintiff's Motion to Compel. ECF 144. Defendants shall promptly provide Miller with a copy of the Peterkin Report and all related emails between Peterkin and Fletcher listed on Defendants' privilege log. In addition, Miller may depose Holsey and the other

---

[8] As noted, the Court carefully reviewed *in camera* the Peterkin Report and is satisfied that the entirety of the Peterkin Report is within the subject matter waiver of the Van Meter Report.

[9] In 2008, Congress enacted legislation adopting Rule 502 of the Federal Rules of Evidence, which discusses attorney-client privilege, work product, and limitations on waiver. Rule 502(a) states that disclosures of privileged communications in federal proceedings extend to undisclosed communications if: "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." It is unclear whether this Rule codifies or supplants the existing common law doctrine of express waiver. *See* Fed. R. Evid. 502 advisory committee's explanatory note ("Moreover, while establishing some exceptions to waiver, the rule does not purport to supplant applicable waiver doctrine generally."). If Rule 502(a) were to govern this case, the Court would reach the same result. Defendants intentionally waived the privileged portions contained within the Van Meter Report; the undisclosed Peterkin memorandum, emails between Peterkin and Fletcher, and the discussion at the Board meeting all concern the same subject matter as the privileged portion of the Van Meter Report; finally, because Defendants assert that the Van Meter Report provided the only basis for banning Miller, it is fair that he be able to review the communications surrounding the Board's decision to adopt the recommendations contained in the Van Meter Report.

Further, although the Court reaches this conclusion based on the doctrine of express waiver, the result would follow under the doctrine of implied waiver. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield."); *United States v. Sanmina Corp.*, 968 F.3d 1107, 1117 (9th Cir. 2020) ("In practical terms, this means that parties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials.") (quotation marks omitted).

Board members, Fletcher, Van Meter, and Peterkin about the Board's discussion on February 13,

2023, of this subject and the Board's decision on that date to adopt Recommendation No. 5 to

ban Miller, as contained in the Van Meter Report.

**IT IS SO ORDERED**.

DATED this 21st day of February, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge