# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **TYLER MILLER**, | Case No. 3:23-cv-293-SI |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| **HENRY HEIMULLER,** in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **BRUCE HOLSEY,** in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **JEFF FLATT,** in his official capacity as Board Member of the Columbia 9-1-1 Communications District; **SHELLEY HENNESSY,** in her official capacity as Board Member of the Columbia 9-1-1 Communications District; and the **COLUMBIA 9-1-1 COMMUNICATIONS DISTRICT**, an Oregon municipal corporation, | |
| Defendants. | |

Clifford S. Davidson, Brett E. Applegate, and Drew L. Eyman, SNELL & WILMER LLP, 601 SW Second Avenue, Suite 2000, Portland, Oregon, 97204. Of Attorneys for Plaintiff.

Karen O'Kasey, HART WAGNER LLP, 1000 SW Broadway, Twentieth Floor, Portland, Oregon, 97205. Of Attorneys for Defendants.

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Michael H. Simon, District Judge.**

Plaintiff Tyler Miller brings this federal civil rights lawsuit under 42 U.S.C. § 1983 against the Columbia 9-1-1 Communications District (the "District") and four individuals in their official capacities who were members of the District's Board of Directors ("Board") during the timeframe at issue. The individual Defendants are Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy. Miller currently is a member of the Board but the decisions and actions that he challenges in this lawsuit occurred before his election to the Board.

As his First Claim, Miller alleges that Defendants violated his First Amendment right to free expression by banning him from attending public meetings of the District, entering District premises, and communicating with District personnel. ECF 89 ¶¶ 10-29 (First Amended Complaint). As his Second Claim, Miller alleges that Defendants violated his First Amendment right to association (or assembly) by banning him from attending public meetings of the District, entering District premises, and communicating with District personnel. *Id.* ¶¶ 30-36. Miller seeks only declaratory and injunctive relief. *Id.* at 13-14. The parties have stipulated to the dismissal of Miller's Third Claim, which alleged First Amendment retaliation. ECF 167.

The Court, sitting without a jury, conducted a bench trial on July 14, 2025. After reviewing the evidence, the parties' objections to that evidence, and the parties' submissions, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact. For the reasons stated below, the Court grants Miller's request for declaratory relief and grants in part his request for a permanent injunction.

<b>FINDINGS OF FACT</b>

The Court finds the following facts by a preponderance of the evidence.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.  Defendants' Decision to Ban Miller**

1.      Tyler Miller is a resident of Scappoose, Oregon, a town located in Columbia County.[1]

2.      The District is the entity in Columbia County that answers 9-1-1 calls and dispatches public safety responses.[2]

3.      The Board is the elected governing body of the District.[3]

4.      Henry Heimuller, Bruce Holsey, Jeff Flatt, and Shelley Hennessy were members of the Board at the timeframe at issue. Holsey was the Board's President at that time.[4]

5.      From 2016 to 2017, Miller worked as a consulting subcontractor for the District. In 2020, Miller was elected to the Scappoose City Council, which appointed Miller as their 9-1-1 communications liaison to the District. Miller has attended more than 100 public District meetings since 2015.[5]

6.      In January 2023, the Board authorized the District's Executive Director at the time, Michael Fletcher, to hire the District's outside counsel, Heather Van Meter, to investigate employee complaints about Miller.[6]

---

[1] ECF 174 (Joint Proposed Findings of Fact and Conclusions of Law) ¶ 1.

[2] *Id.* ¶ 2.

[3] *Id.* ¶ 3.

[4] *Id.* ¶ 4.

[5] *See* First Miller Decl. (ECF 3) ¶¶ 3, 5; Second Miller Decl. (ECF 69) ¶ 5; Third Miller Decl. (ECF 76) ¶ 10.

[6] ECF 174 ¶ 6.

7.      That same month, Fletcher hired Van Meter to conduct this investigation. He provided her with a packet of text messages that Miller had exchanged with District employee Chandra Egan between 2015 and 2017 ("the Text Messages").[7]

8.      On February 6, 2023, Van Meter sent a 17-page memorandum (the "Van Meter Report") to District General Counsel Michael Peterkin.[8]

9.      On February 23, 2023, the Board held an executive session. At that session, Fletcher shared the Van Meter Report and the Text Messages with the Board.[9]

10.     Before receiving the Van Meter Report at that meeting, the Board had never previously discussed banning Miller from attending public meetings. Nor had the Board previously discussed any employee complaints about Miller.[10]

11.     At this meeting, the Board voted "to authorize general counsel to issue a notice of no contact and no trespass to Tyler Miller effective immediately, and to remain in effect until further Board action" (the "Ban").[11]

12.     The Board based its decision to ban Miller *solely* on (a) the contents of the Van Meter Report and (b) the Text Messages.[12]

13.     The Board did not record this session or create minutes of it.[13]

---

[7] *Id.* ¶ 7; Ex. 1.

[8] Ex. 2.

[9] *See* ECF 204 (Trial Transcript ("Trial Tr.")) 10:4-22, 13:8-10.

[10] *Id.* 12:9-15.

[11] ECF 174 ¶ 11.

[12] *Id.* ¶ 13.

[13] *Id.* ¶ 10.

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

14.    On February 23, 2023, Michael Peterkin, the District's general counsel, sent

Miller the following letter ("Ban Letter"):

> Dear Mr. Miller:
>
> **NOTICE:** You are not permitted to enter the District's premises or
> any property owned or leased by the District, including remote
> tower sites. You are not allowed to attend the District's public
> meetings in person. You may attend District public meetings by
> remote means. A remote access link will be included in all the
> District's public meeting notices. You may make remote
> presentations to the Board under the operative District rules. You
> may continue to audio record or videotape meetings through the
> link provided or by proxy if the on-site recording is open, obvious,
> and unobtrusive.
>
> **ADDITIONAL NOTICE**: You are further notified not to contact
> District employees directly, indirectly, or through the District's
> communications systems except in an emergency. If you need to
> contact the District for non-emergency reasons, you may only call
> (971) 415-4714. The District will respond to written public records
> requests in writing in the ordinary course.
>
> The above notices are necessary to shield District employees from
> your conduct, which has created a hostile work environment. You
> have no right to harass and intimidate district employees with your
> words, your conduct, or with offensive, sexually explicit images.
> Further, you have no right to put employees in fear of you or fear
> that you will retaliate against them.
>
> **FAILURE TO COMPLY**. If you fail to comply with the above
> notices, you will be subject to civil or criminal actions. Local law
> enforcement will be provided a copy of this notice for future
> enforcement purposes.
>
> Sincerely,
>
> Michael W. Peterkin[14]

---

[14] *Id.* ¶ 12; Ex. 5.

15.     On March 13, 2023, the Court entered a Temporary Restraining Order (ECF 20) stating that Miller may physically attend any public meeting that the Board conducts in person that is otherwise open to the public.

16.     On May 18, 2023, the Court entered a Preliminary Injunction (ECF 52) stating that Defendants may not preclude Miller from physically attending any public meetings on District property. The Court further preliminarily enjoined Defendants from prohibiting Miller from contacting District employees other than Egan and Hooper.

17.     Miller was elected to the Board in May 2025 and took office on July 1, 2025.[15]

**B.  The Van Meter Report**

18.     The Van Meter Report sought "to investigate a recent concern expressed by a district employee" concerning "fear of harassment, bullying, intimidation, and possible retaliation by Tyler Miller against district employees."[16]

19.     The Van Meter Report begins by providing a "Policy and Legal Background." This section includes a summary of the District's Equal Opportunity Employment policy; Workplace Violence policy; Discrimination and Workplace Harassment policy; and Inappropriate Conduct policy.[17]

20.     The Van Meter Report then details several allegations made by District employees about Miller. Van Meter sorted these allegations into the following categories:

---

[15] ECF 174 ¶ 5.

[16] Ex. 2 at 2.

[17] *Id.* at 2-4.

Harassment and Gender-Based Harassment; Intimidation/Bullying; Unwillingness to

Communicate Appropriately; Personal Safety Concerns; and Retaliation Concerns.[18]

21.    The Van Meter Report concludes with a discussion of the "Impact on District

Operations and Personal Liability Issues," "Conclusions," and "Recommendations" from Van

Meter to the Board about how to address the concerns about Miller without incurring legal

liability.[19] The text of one of Van Meter's recommendations is nearly identical to the text of the

Ban Letter.[20]

**C.  Miller's Conduct Towards District Employees**

22.    In the Van Meter Report, Van Meter states that she interviewed five employees

who had negative prior experiences with Miller.[21]

23.    Chandra Egan and Danell Hooper are two of these employees.

**1.  Chandra Egan**

24.    Egan has worked at the District for about 20 years. She has worked as a Computer

Aided Dispatch ("CAD") specialist since 2015. As a CAD specialist, she programs the back side

of the 911 system used to answer calls.[22]

25.    Egan's role required her to attend Board meetings in person.[23]

---

[18] *Id.* at 6-12.

[19] *Id.* at 12-17.

[20] *Id.* at 15 (recommendation no. 5).

[21] *Id.* at 2.

[22] Trial Tr. 20:17-21:5.

[23] *Id.* 24:23-25.

26.    Egan met Miller before she became a CAD specialist but communicated with him more frequently after she began that role. The District contracted Miller to work on a radio testing project. Egan and Miller would communicate by email and text message regarding that project.[24]

27.    Although many of the text messages between Egan and Miller concerned work-related issues,[25] others were less professional. For example, Egan and Miller sent each other memes and other images.[26] Some of these images included sexual material.[27] Many, but not all, of these images were sent by Miller to Egan; Egan often responded with words and emojis indicating amusement.[28]

28.    At one point, Miller sent Egan an image of his naked bottom.[29] Egan responded, "I hate you."[30] She testified at trial that she found those messages "disgusting."[31]

---

[24] *Id.* 21:6-24.

[25] *See, e.g.*, Ex. 1 at 3 (Miller requesting that Egan print a document), 12-18 (coordinating dates to schedule testing).

[26] *See, e.g., id.* at 4 (Miller sending Egan an image with the question "Are you drunk?"), 25 (Egan thanking Miller for a holiday card), 67 (Egan asking Miller for a restaurant recommendation), 75 (Egan and Miller jokingly using coarse language), 79 (Egan sending Miller a photo collage for his birthday).

[27] *See, e.g., id.* at 84, 86, 89, 90, 91, 100, 105, 107.

[28] *See, e.g., id.* at 84 ("That's f****** hilarious!"), 86 ("Oh. My. Lord. Stop taking pictures of your mom and sister."), 105 ("Oh my lord!").

[29] *Id.* at 118-121.

[30] *Id.* at 121.

[31] Trial Tr. 23:11-12.

29.     Miller's conduct grew to be verbally "aggressive," and he began verbally "fighting" with District employees, including Egan's managers.[32]

30.     Egan did not observe Miller engaging in any physical violence.[33]

31.     Egan stopped attending meetings in person because of her concerns about Miller's conduct.[34]

32.     Egan cut off direct communication with Miller in January 2017.[35]

**2.  Dannell Hooper**

33.     Hooper has worked at the District for about 20 years. She served as the Operations Manager since 2022.[36] In her role, she supervises 911 dispatchers, public records requests, the training and certification coordinator, and contract employees. Her role requires her to attend Board meetings, sometimes in person.[37]

34.     When Hooper attends Board meetings, it is generally to provide the Board with an operations report. These reports often address current staffing levels, recruitment efforts, milestones, training updates, community events, and other projects. Hooper ends these reports by taking questions from Board members.[38]

---

[32] *Id.* 25:4-14, 31:23-32:8, 45:1-4.

[33] *Id.* 30:4-6, 32:4-6.

[34] *See id.* 25:5-10, 26:1-4.

[35] *Id.* 24:3-13.

[36] *Id.* 49:23-50:5.

[37] *Id.* 50:8-18.

[38] *Id.* 50:21-51:5.

35.     Hooper attended in-person Board meetings that Miller also attended as a member of the public.[39]

36.     Hooper testified at trial that there were times that Miller "gave public comment where he was visibly agitated" and "made comment outside of the time that public comment is allowed." There were "a lot" of meetings during which Miller would "position himself physically between the door and [the] staff," which Hooper felt was "intimidating." Miller would also "position[] himself in the every front of the front door" or "stand[] by his car for very long periods of time." When Hooper would give her report to the Board, Miller on at least one occasion moved a podium in the meeting room to position himself "closer." He would also talk under his breath or scoff while Hooper delivered her report. When engaging with District employees, Miller was "extremely critical"[40]

37.     On one occasion "years ago", Hooper overheard Miller make a sexually charged comment during a ride-along with an officer and Miller, who was then a reserve deputy.[41]

38.     Hooper has not observed or heard of any instances of Miller actually being violent toward anyone.[42] Hooper has not observed Miller direct physically intimidating behavior specifically at her.[43] Miller has not yelled or otherwise raised his voice at Hooper.[44]

---

[39] *Id.* 51:6-11.

[40] *Id.* 51:15-18, 52:5-21, 53:17-21, 55:5-11, 55:12-17.

[41] *Id.* 61:13-62:1.

[42] *Id.* 64:5-8.

[43] *Id.* 53:22-24.

[44] *Id.* 60:21-61:4.

39.     Before the Ban went into effect, Hooper requested to attend Board meetings virtually. She attended meetings in person whenever Miller was absent.[45]

40.     Hooper has seen and interacted with Miller at Board meetings as recently as May 2025. At the May meeting, Miller asked the Board a question outside of his public comment time, and Hooper answered the question. Although Miller's tone of voice was not aggressive or hostile, he did move from the public area and into the middle of the room to ask his question, which people generally do not do.[46]

## CONCLUSIONS OF LAW

1.     Among other things, the First Amendment protects an individual's right to "speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Smith v. Ark. State Highway Emps., Loc. 1315*, 441 U.S. 463, 464 (1979). The Constitution's prohibition on the encroachment of First Amendment protections, however, "is not an absolute." *Elrod v. Burns*, 427 U.S. 347, 360 (1976). "Restraints are permitted for appropriate reasons." *Id.*; *see also Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 (1961) (rejecting "the view that freedom of speech and association, as protected by the First and Fourteenth Amendments, are 'absolutes'" (citation omitted)).

### A.  First Amendment Right of Expression

2.     The Supreme Court has articulated a three-part test for evaluating a restriction on expression. Courts must consider: (1) whether the First Amendment protects the plaintiff's expression; (2) the nature of the forum; and (3) whether the justifications offered for limiting or excluding speech from the relevant forum satisfy the requisite standards. *See Cornelius v.*

---

[45] *Id.* 54:8-20.

[46] *Id.* 59:18-60:16.

*NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). The first and second elements are not at issue in this case. With respect to the first element, the Court and the parties agree that Miller's presence and participation at District meetings possess "sufficient communicative elements" to be protected under the First Amendment.[47] *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). Turning to the second element, District meetings are what the law refers to as "limited public fora." *See Reza v. Pearce*, 806 F.3d 497, 503 (9th Cir. 2015) ("[C]ity council meetings, where the public has the opportunity to address officers of local government or local governmental agency, are limited public fora."); *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1127 (D. Or. 2015) ("City council meetings are limited public forums." (citing *Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010)). Thus, what is before the Court with respect to Claim One is the third element of the *Cornelius* framework: whether the justifications offered for the Ban satisfy the standards governing speech in a limited public forum.

3.      In a limited public forum, restrictions on speech "are permissible if they are viewpoint neutral and reasonable in light of the purpose served by the forum." *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1049 (9th Cir. 2003); *see also Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270-71 (9th Cir. 1995) ("[L]imitations on speech at [city council and city board meetings] must be reasonable and viewpoint neutral, but that is all they need to be."). Although the Ban targets only Miller and does not apply to other members of the public, Miller does not contest the viewpoint neutrality of the Ban. Rather, he asserts that even if the

---

[47] As the Court explained in its Opinion and Order granting in part Miller's motion for summary judgment, Miller's presence at District meetings possessed "sufficient communicative elements" because "the evidence shows that Miller's presence at District meetings was intended to convey a message and it was likely to be understood as such by those who viewed it." *Miller v. Heimuller*, 2024 WL 1075272, at *6 (D. Or. Mar. 12, 2024).

factual allegations about his conduct toward District employees are true, a *prospective* ban on attending District meetings was unreasonable.

4. Courts evaluate the reasonableness of a restriction on expressive conduct in a limited public forum "in light of the purpose of the forum and all the surrounding circumstances." *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008) (quoting *Cornelius*, 473 U.S. at 809). The reasonableness requirement demands "more of a showing than does the traditional rational basis test; *i.e.*, it is not the same as 'establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power.'" *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1996) (alteration in *Tucker*) (quoting *Multimedia Publ'g Co. of S.C., Inc. v. Greenville—Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). To show that a restriction is reasonable, the government must offer "evidence that the restriction reasonably fulfills a legitimate need." *Sammartano v. First Jud. Dist. Ct., in & for Cnty. of Carson City*, 303 F.3d 959, 967 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Public safety concerns, the avoidance of disruptions, and the existence of alternative communication channels are all relevant to a restriction's reasonableness. *See Swarner v. United States*, 937 F.2d 1478, 1482 (9th Cir. 1991); *Hale v. Dep't of Energy*, 806 F.2d 910, 917 (9th Cir. 1986).

5. The Court begins with the purpose of the forum. The purpose of the limited public forum here—public District meetings—is to foster public discourse and robust debate about community issues relevant to the operations and objectives of the District. Meetings such as these, "where the public is afforded the opportunity to address [community leaders], are the focus of highly important individual and governmental interests." *White v. City of Norwalk*, 900

F.2d 1421, 1425 (9th Cir. 1990); *see also id.* at 1425 (9th Cir. 1990) ("Citizens have an enormous first amendment interest in directing speech about public issues to those who govern their city."); *Boos v. Barry*, 485 U.S. 312, 318 (1988) (explaining that the First Amendment "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open'" (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964))).

6.       Having considered the purpose of the forum, the Court turns to the surrounding circumstances of the Ban. Defendants argue that Miller's physical presence at Board meetings disrupted Egan and Hooper's work environment to the extent that a prospective ban was necessary. Defendants assert that, as an employer, they had an obligation to protect District employees from harassing conduct by third parties. After reviewing the Van Meter Report and text messages, Defendants appear to have learned that Miller had allegedly, among other things, engaged in sexually inappropriate and unwelcome communications with Egan; posted dispatcher recordings on social media—causing a dispatcher "severe anxiety"; yelled at District employees; repeatedly stood over District employees, "arms folded, in an imposing and bulling manner at public meetings"; and made a sexual comment, while acting as a reserve deputy, in the presence of a District employee. *See generally* Van Meter Report. In addition, Egan and Hooper reported that although attending Board meetings in person is part of their regularly assigned job duties, they stopped doing so because of Miller. They also avoided working as back-up dispatchers because of Miller's alleged aggression.

7.       As noted, Egan further testified at trial that she felt uncomfortable when Miller attended public meetings because he would raise his voice, interrupt other attendees when they were speaking, and act "agitated." Hooper further added at trial that Miller was "intimidating"

and "extremely critical." At public meetings, he would often position himself between District staff and the door. He would stand in the parking lot by his car for "very long periods of time," causing Hooper to feel unsafe walking back to her own car. She described incidents when Miller would position himself behind Hooper while she would present, and would talk, scoff, and make other noises.

8.      Although none of these interactions with Miller involved acts of physical contact or violence, the Court agrees with Defendants that Egan and Hooper presented legitimate concerns. *See, e.g.*, *Reza*, 806 F.3d at 507 (agreeing that "the interest in keeping a government building accessible and safe is both legitimate and significant" (quotation marks omitted)). But Defendants could have taken other steps to address those concerns that did not involve a prospective ban. For example, they could have instructed Miller always to stay more than 15 feet away (or some other appropriate distance) from Egan and Hooper. They also could have further instructed Miller not to engage in any direct or indirect communication with Egan and Hooper without explicit permission from District counsel. Defendants could have reported unlawful conduct to relevant law enforcement authorities or sought a "protective order" from a court. *Cf. Walsh*, 154 F. Supp. 3d at 1118 (explaining that "a sufficiently disruptive person may even be prosecuted for such conduct if public law permits"). In fact, both Egan and Hooper testified at trial that they would feel more comfortable if Miller is only allowed to attend public meetings if he keeps a specified distance away from them and may not communicate with them, aside from in his current capacity as a Board member.

9.      In addition to mandating that Miller maintain an appropriate physical distance from Egan and Hooper, Defendants could have excluded Miller from any public meeting during which he caused a disruption. It is reasonable for local councils immediately to exclude a

disruptive individual from a meeting for the duration of *that* meeting. *See, e.g.*, *White*, 900 F.2d at 1426 ("Speakers are subject to restriction only when their speech 'disrupts, disturbs, or otherwise impedes the orderly conduct of the Council meeting.' So limited, we cannot say that the ordinance on its face is substantially and fatally overbroad."); *Kindt*, 67 F.3d at 271 (finding no First Amendment violation because "[i]n general, when Kindt was actually ejected from the Board meetings[,] he was disrupting the proceedings by yelling and trying to speak when it was not time for [public comments]"); *see also Norse*, 629 F.3d at 976  (holding that a presiding officer may eject an attendee only for *actually* disturbing or impeding a meeting, not for "constructive disruption, technical disruption, virtual disruption, *nunc pro tunc* disruption, or imaginary disruption"); *Walsh*, 154 F. Supp. 3d at 1129 ("Undeniably, Defendants had authority to exclude Walsh on the day of his disruption."); *Glass v. Forster*, 2020 WL 3077868, at *5 (D. Or. June 10, 2020) (concluding that the plaintiff's First Amendment rights were not violated when he was removed from a candidate forum because he became disruptive). Therefore, "the simpler available alternative is removal from any meeting that a [plaintiff] actually disrupts." *Walsh*, 154 F. Supp. 3d at 1129. But that is not what happened here. Rather than exclude Miller from any particular meeting, the Board decided to ban him from physical attendance at *all* future meetings.

10.     "There is no requirement that a governmental regulation of a limited public forum be the 'most reasonable' or the 'only reasonable' limitation on the forum." *Cogswell v. City of Seattle*, 347 F.3d 809, 818 (9th Cir. 2003). Moreover, reasonableness in this context "is not the legal equivalent of narrow tailoring or least restrictive means." *Flint v. Dennison*, 488 F.3d 816, 834-35 (9th Cir. 2007). Nevertheless, the District's "'failure to select . . . simple available alternative[s] suggests' that the ban it has enacted is not reasonable." *Tucker*, 97 F.3d at 1216

(alterations in *Tucker*) (quoting *Multimedia Publ'g*, 991 F.2d at 161). As discussed, the District could have taken several simpler and less restrictive alternative approaches to a permanent, prospective ban. Nothing in the record shows that Miller actually threatened anyone with violence, encouraged others to engage in violence, or refused voluntarily to leave a meeting that the District ordered him to leave. *Cf. Walsh*, 154 F. Supp. 3d at 1132 (examining these factors to conclude that a prospective ban was unreasonable). Thus, with other alternate remedies readily available to Defendants, avoidance of future disruption simply does not justify the wholesale prospective Ban at issue.

11.     As noted, the reasonableness inquiry for restrictions in limited public fora also considers "whether the restrictions imposed leave open alternative channels of communication." *Reza*, 806 F.3d at 504. The Court and the parties had addressed the possibility of Miller attending meetings virtually within the context of other claims that were not before the Court at trial. But neither party argued at trial about whether there were reasonable alternative channels of communication available to Miller, and the extent to which those channels would have addressed the claims brought at trial. Although the option of virtual attendance may be available and does not *completely* foreclose communication, it does make that communication more difficult. As discussed, the purpose of public meetings like the ones at issue is to foster public discourse and galvanize public support or opposition to issues. Requiring someone to participate virtually forecloses that person's ability fully and meaningfully to engage with their peers.

12.     In short, the Court understands the District's concerns regarding Miller's conduct toward District employees. A permanent, prospective ban, however, was a disproportionately severe reaction. The Ban therefore fails the Ninth Circuit's requirement that restrictions on

speech in a limited public forum be reasonable. The Court concludes that the District

impermissibly violated Miller's First Amendment right of expression.

## B. First Amendment Right to Association

13.     "The Constitution guarantees freedom of association . . . as an indispensable

means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618

(1984). "Protected association furthers 'a wide variety of political, social, economic, educational,

religious, and cultural ends,' and 'is especially important in preserving political and cultural

diversity and in shielding dissident expression from suppression by the majority.'" *Ams. for*

*Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts*, 468 U.S. at 622). "The

right to associate for expressive purposes is not, however, absolute." *Roberts*, 468 U.S. at 623.

The right to expressive association "can be infringed upon if that infringement is: (1) unrelated to

the suppression of expressive association; (2) due to a compelling government interest; and (3)

narrowly tailored." *Givens v. Newson*, 459 F. Supp. 3d 1302, 1314 (E.D. Cal. 2020) (citing

*Roberts*, 468 U.S. at 623). Additionally, "[p]arties bringing an expressive-association claim

under the First Amendment must demonstrate that they are asserting their right to associate 'for

the purpose of engaging in those activities protected by the First Amendment—speech,

assembly, petition for the redress of grievances, and the exercise of religion.'" *Id.* (quoting

*Roberts*, 468 U.S. at 618).

14.     Miller does not contest that the Ban is unrelated to the suppression of expressive

association. He does argue, however, that Defendants failed to show that they had a compelling

government interest in enacting the Ban and that the Ban was narrowly tailored. For the purposes

of this analysis, the Court assumes that the Ban was grounded in a compelling government

interest: protecting employees in the workplace from harassment and other unreasonable

conduct. Nevertheless, Defendants violated Miller's right to association because they did not narrowly tailor the Ban.

15.     An infringement on expressive association satisfies the "narrowly tailored" requirement when furtherance of the identified compelling state interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. As the Court explained above, Defendants had significantly less restrictive alternatives to the Ban that would have protected District employees and not required them to change how they did their jobs. Accordingly, the Ban was not narrowly tailored. The Court concludes that the District impermissibly violated Miller's First Amendment right to association.

## C. Relief

### 1. Declaratory Relief

16.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows individuals to seek a declaration of the constitutionality of the disputed governmental action. *See Duke Power Co. v. Carolina Env't Study Grp., Inc.,* 438 U.S. 59, 71 n.15, (1978). To issue a declaration, the Court must address two conditions. "First, the court must inquire whether there is a case of actual controversy within its jurisdiction." *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). Second, "the court must decide whether to exercise that jurisdiction. The statute gives discretion to courts in deciding whether to entertain declaratory judgments[.]" *Id.* at 143-44.

17.     Miller seeks declaratory relief in the form of a declaration stating that the Ban violates Miller's First Amendment right to (a) expression and (b) association or assembly. Here, neither party disputes that declaratory relief is appropriate, and the Court agrees that both elements of the test are met. Specifically, neither party disputes that Miller has standing to bring this lawsuit, and neither of his claims are moot. Therefore, there is an actual controversy. Second, exercise of the Court's discretion is appropriate. Defendants violated Miller's

constitutional rights. Declaratory relief will serve to vindicate those rights and clarify the degree

of constitutional protection that must be afforded to speakers in limited public fora. Accordingly,

the Court grants Miller's request for a declaratory judgment to the extent provided below.

### 2. Permanent Injunctive Relief

18.      Second, Miller seeks a permanent injunction enjoining Defendants from enforcing

the Ban. When a plaintiff seeks a permanent injunction, he or she must satisfy a four-factor test

before a court may grant such relief. A plaintiff must demonstrate: (1) that he or she has suffered

an irreparable injury; (2) that remedies available at law are inadequate to compensate for that

injury; (3) that the remedy in equity is warranted considering the balance of hardships between

the plaintiff and defendant; and (4) that a permanent injunction would not be contrary to the

public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-67 (2010) (quoting

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006)).

19.      Before turning to this analysis, the Court notes that the parties disagree about the

scope of injunctive relief. Miller asks the Court permanently to enjoin Defendants from

enforcing the *entirety* of the Ban, including the following two provisions:

> **NOTICE:** You are not permitted to enter the District's premises or
> any property owned or leased by the District, including remote
> tower sites. You are not allowed to attend the District's public
> meetings in person.
>
> . . .
>
> **ADDITIONAL NOTICE**: You are further notified not to contact
> District employees directly, indirectly, or through the District's
> communications systems except in an emergency.

Defendants argue that if the Court chose to grant injunctive relief, the injunction should address

*only* the ban on Miller's in-person attendance at public meetings and *not* disturb the Ban insofar

as it prevents Miller from (1) accessing District property; and (2) contacting District employees.[48]

20.     Turning to the *Monsanto* factors, Miller has suffered the irreparable injury of having his speech at District meetings prospectively suppressed in the period between February 23, 2023, when the Ban went into effect, and March 13, 2023, when the Court entered its temporary restraining order. In the absence of an injunction enjoining his attendance from meetings, the District would likely continue to suppress Miller's constitutional rights. He does not seek money damages, nor would remedies at law adequately compensate him for the violation of his First Amendment rights. *See, e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996) (finding that irreparable harm stemming from constitutional violations "cannot be adequately compensated at law"); *Nelson v. Nat'l Aeronautics & Space Admin.*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd and remanded on other grounds*, 562 U.S. 134 (2011). Thus, placing aside the scope of injunctive relief for the moment, Miller satisfies the first two factors of this test.

21.     In its consideration of the third factor, the Court has a "duty to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (cleaned up). Accordingly, the Court considers both Miller's First Amendment rights and the District's interest in facilitating a safe working environment for Egan, Hooper, and other employees.

---

[48] In the alternative, Defendants argue that Miller abandoned his request to enjoin the entire Ban based on which claims he chose to bring to trial. Because the Court agrees with Defendants on the merits that only narrower injunctive relief is appropriate, the Court declines to further address Defendants' argument based on abandonment.

22.    As noted, both Egan and Hooper testified that they would feel more comfortable if Miller must (1) always maintain appropriate physical distance from them; and (2) refrain from communicating—directly or indirectly—with them in the absence of their consent, except to the extent required by Miller's current elected position. Miller offered no evidence to suggest that he needs to be within a particular distance of Egan or Hooper to do his job as a Board member going forward. As for communicating with District employees, Miller has no reason directly communicate with Egan for either of them properly to do their jobs. *See* Trial Tr. 47:22-48:9. Because Hooper makes presentations to the Board and answers questions from the Board at official meetings, she may need to interact with Miller in his official capacity as a Board member at those meetings. *See id.* 68:1-6. But Miller has no reason directly to communicate with Hooper outside of those board meetings, either. Therefore, a permanent injunction conditioning Miller's ability to attend district meetings in person on a restriction limiting his ability to approach or communicate with Egan and Hooper would appropriately strike a reasonable balance between Miller's interest and the District's.

23.    Turning to the parties' arguments about the scope of the injunction, the Court agrees with Defendants that an order enjoining the entirety of the Ban is inappropriate. For the reasons discussed, the Ban in unconstitutional insofar as it prevents Miller from attending public meetings in person. But Miller has not shown how a prohibition on entering generally restricted District property or contacting District employees outside of public meetings or other public necessity violated Miller's First Amendment rights to expression and association. Of course, Miller may need to enter certain District premises in his capacity as a Board member, namely, to attend meetings. And, as discussed, Miller may need to communicate with certain District employees to fulfill his obligations as a Board member. But aside from these practical carve outs,

the Court declines to enjoin the Ban in its entirety. The Court will balance Miller's rights with the District's interests by enjoining the Ban insofar as it prevents Miller from physically attending District meetings or otherwise fulfilling his role as a Board member.

24.     Finally, "[t]he public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano*, 303 F.3d at 974. There is a "significant public interest in upholding First Amendment principles." *Id.* (collecting cases). On the other hand, there is also a significant public interest in ensuring that public fora are safe places for people to engage in public discourse. The conditional injunction achieves a balance between these interests by allowing Miller to attend public meetings with limited, if any, contact with employees. Moreover, for the reasons discussed above, the District retains the power to expel Miller from any particular meeting at which he presents a legitimate threat to the other attendees.

25.     Having weighed the four *Monsanto* factors, the Court concludes that a limited, permanent conditional injunction appropriately redresses and protects going forward Miller's First Amendment rights while also protecting the District's interests in employee safety. The injunction will be conditioned on the following two requirements.[49] First, Miller must always maintain a distance of 15 feet from both Egan and Hooper.[50] Second, apart from asking questions of Hooper during Board meetings in his official capacity as a Board member, Miller may not initiate communications with Egan or Hooper directly or indirectly, in person, by text, by phone,

---

[49] The Court is not aware of, and the parties have not provided, any precedent that prohibits district courts from granting conditional injunctive relief. Indeed, that power is "inherent in the court, as a court of equity, and has been exercised from time immemorial." *Inland Steel Co. v. United States*, 306 U.S. 153, 156 (1939) (quotation marks omitted).

[50] *See* Trial Tr. 47:4-11 (Egan explaining that a distance of 15 feet would be sufficient both for Miller's needs and hers).

PAGE 23 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

by email, or otherwise. The Court will retain jurisdiction pursuant to the All Writs Act, 28 U.S.C.

§ 1651, to enforce the terms of the conditional injunction against any party.

## CONCLUSION

For the reasons provided, the Court GRANTS declaratory relief and permanent injunctive

relief, as stated herein, and in the accompanying Judgment. The Court retains jurisdiction to

enforce the terms of this ruling.

**IT IS SO ORDERED**.

DATED this 15th day of August, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge